AFFIRM, REVERSE, and REMAND; and Opinion issued April 5, 2013



In The

# Court of Appeals

## Fifth District of Texas at Dallas

### No. 05-11-00971-CV

## RONALD FORTNER AND PAM FORTNER, Appellants

## V.

## HOSPITAL OF THE SOUTHWEST, LLP D/B/A THE HEART HOSPITAL BAYLOR PLANO; GARY E. ERWIN, JR., M.D.; JEFF TAYLOR, M.D.; GREGORY MESSNER, D.O.; HEALTH TEXAS PROVIDER NETWORK D/B/A DALLAS DIAGNOSTIC ASSOCIATION–PLANO; JAMES E. RELLAS, M.D., P.A. D/B/A HEARTFIRST CARDIOLOGY CENTER; AND MEDICAL EDGE HEALTHCARE GROUP, P.A. D/B/A THE TEXAS CLINIC AT PRESTONWOOD, Appellees

### On Appeal from the 101st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 10-02994-E

# OPINION

Before Justices FitzGerald, Fillmore, and Richter[1]
Opinion By Justice Fillmore

This appeal follows the trial court's dismissal of the health care liability claims asserted by appellants Ronald Fortner and Pam Fortner against appellees Hospital of the Southwest, LLP d/b/a The Heart Hospital Baylor Plano (Baylor Hospital), Gary E. Erwin, Jr., M.D. (Dr. Erwin), Jeff Taylor, M.D. (Dr. Taylor), Gregory Messner, D.O. (Dr. Messner), Health Texas Provider Network d/b/a Dallas Diagnostic Association—Plano (Dallas Diagnostic), James E. Rellas, M.D., P.A. d/b/a

---

[1] The Honorable Martin E. Richter, Retired Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

HeartFirst Cardiology Center (HeartFirst), and Medical Edge Healthcare Group, P.A. d/b/a The Texas Clinic at Prestonwood (Texas Clinic) as a result of appellees' challenges to the sufficiency of appellants' experts' reports. In a single issue, appellants contend the trial court abused its discretion in concluding the expert reports in this case fail to comply with the requirement of civil practice and remedies code section 74.351 that an expert report demonstrate a causal relationship between the failure of a physician or health care provider to meet an applicable standard of care and the injury, harm, or damage claimed. We affirm the trial court's judgment in part, reverse the trial's judgment in part, and remand this cause to the trial court for further proceedings.

## Background

### Facts Alleged by Appellants

We recite the facts as alleged in appellants' First Amended Petition, their live pleading at the time of the trial court's orders dismissing all claims brought by appellants against appellees. On July 14, 2008, appellant Ronald Fortner had an initial consultation with Dr. Messner, after a diagnostic test earlier that day indicated Mr. Fortner suffered from multi-vessel coronary disease and complex plaque. Dr. Messner recommended surgery on an emergent basis and performed a four vessel quadruple coronary artery bypass graft the following day at Baylor Hospital. Post-operatively, Drs. Messner, Erwin, and Taylor and employees of Baylor Hospital were responsible for providing Mr. Fortner's healthcare.

"During and/or after surgery," Mr. Fortner suffered from various problems including sustained periods of severe hypotension. "Shortly after surgery and contemporaneous with the hypotension," Mr. Fortner began complaining of visual disturbances and partial loss of vision, first in one eye and then in the other. Appellants claim Drs. Messner, Erwin, and Taylor and Baylor Hospital nursing or medical staff were aware of Mr. Fortner's vision-related complaints "when and as Mr. Fortner was experiencing and expressing such complaints in proximity to events which tended

to explain their occurrence, cause and severity" but did not provide or obtain necessary medical intervention. An ophthalmologist was not consulted to evaluate Mr. Fortner until about twenty-seven hours after he began complaining about vision loss, by which time he was blind in both eyes.

### Appellants' Theories of Liability

Appellants allege Drs. Messner, Erwin, and Taylor, and Baylor Hospital were negligent and grossly negligent.[2] Appellants further allege Dallas Diagnostic is vicariously liable for the negligence of its members, Drs. Erwin and Taylor; HeartFirst and Texas Clinic are vicariously liable for the negligence of its employee, Dr. Messner; and Baylor Hospital is vicariously liable for the negligence of its "employees, agents, ostensible agents and representatives."

### Dismissal of Appellants' Claims

Pursuant to section 74.351 of the civil practice and remedies code, appellants served appellees with an expert report prepared by John Kress, M.D., a board-certified pulmonary and critical care medicine physician, in support of their claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011) (in a health care liability claim, claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted). Appellees filed objections challenging the sufficiency of Dr. Kress's report as failing to comply with the requirements of section 74.351. *See*

---

[2]   Appellants allege Drs. Messner, Erwin, and Taylor were negligent and grossly negligent by failing to: (1) properly and thoroughly examine Mr. Fortner, (2) properly and thoroughly assess and diagnose Mr. Fortner, (3) properly document Mr. Fortner's physical condition, (4) provide Mr. Fortner with adequate and/or timely treatment for his medical conditions, (5) order required treatment or care for Mr. Fortner on a timely basis, (6) obtain appropriate specialized care and/or consultation for Mr. Fortner's condition which these appellees were unable to diagnose or treat.

    Appellants allege Baylor Hospital, either directly through its own acts or omissions or under the doctrine of *respondeat superior*, was negligent by: (1) failing to properly document Mr. Fortner's physical condition, (2) failing to properly transmit documentation concerning Mr. Fortner's physical condition to the appropriate and necessary recipients, (3) failing to properly and timely communicate or ensure proper and timely communication of information pertaining to Mr. Fortner's physical condition or changes in his diagnosis or condition among and between the health care providers who were responsible for treating and diagnosing his condition, (4) authorizing the "doing and the manner of the acts and omissions in question," (5) recklessly employing personnel who were unfit, incompetent, or unqualified to perform the duties assigned to them, (6) employing personnel in managerial positions who were acting within the course and scope of their employment at the time the negligent acts or omissions occurred and failed to prevent such acts or omissions, and (7) ratifying or approving the negligent acts or omissions in question through its officers, managers, supervisors, directors, administrators, or nurses.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) ("expert report" means a written report by an expert that provides a fair summary of expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and injury, harm, or damages claimed).

At the November 2010 hearing on appellees' objections to the sufficiency of Dr. Kress's expert report, the parties announced on the record their agreement to an extension of time for appellants to attempt to cure deficiencies in Dr. Kress's expert report regarding the statutory requirement that the expert report demonstrate a causal relationship between the alleged failure to met the applicable standard of care and Mr. Fortner's injury. It was the parties' agreement that this extension would serve as the one-time extension authorized in section 74.351(c). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (if expert report has not been served within the period specified in section 74.351(a) because elements of report are found deficient, court may grant one 30-day extension to claimant in order to cure the deficiency). At the hearing, the trial judge stated he believed Dr. Kress's report was deficient with respect to causation.

Appellants served appellees with a supplemental report from Dr. Kress and a report from a new expert, Alfredo A. Sadun, M.D., Ph.D., a board-certified ophthalmologist with a clinical specialty in neuro-ophthalmology. Appellees filed objections to the reports of Dr. Kress and the report of Dr. Sadun, asserting the reports, whether considered separately or collectively,[3] did not cure the alleged deficiencies, and moved to dismiss appellants' health care liability claims with prejudice pursuant to section 74.351(b)(2). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(2) (if health care liability claimant does not serve expert report as required, the trial court must, upon motion by

---

[3] Reports may be considered together in determining whether a claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i).

affected physician or health care provider, dismiss claim with prejudice).

The trial court conducted a March 2011 hearing on appellees' objections to appellants' experts' reports and appellees' motions to dismiss. The trial court concluded appellants' experts' reports fail to provide any opinion concerning a causal connection between any failure to meet the applicable standards of care and injuries and damages claimed by appellants, and, therefore, the experts' reports were insufficient and did not satisfy the requirements of section 74.351. Having concluded appellants' experts' reports did not meet the causation requirement of section 74.351, by order signed June 17, 2011, the trial court granted HeartFirst and Texas Clinic's motion to dismiss and ordered all claims brought by appellants against HeartFirst and Texas Clinic dismissed with prejudice. By order signed September 26, 2011, the trial court granted the motions to dismiss of Drs. Messner, Erwin, and Taylor, Dallas Diagnostic, and Baylor Hospital and ordered all claims brought by appellants against them dismissed with prejudice.[4] Appellants filed this appeal of the trial court's dismissal of their health care liability claims.

## Discussion

### Standard of Review

We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Texas v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Nexion Health at Terrell Manor v. Taylor,* 294 S.W.3d 787, 791 (Tex. App.—Dallas 2009, no pet.). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding). An abuse of discretion occurs if the trial court clearly fails to analyze or apply the law correctly. *Id.*

---

[4] Section 74.351(b)(1) provides that if an expert report has not been served within the time period specified, the trial court, on a proper motion, shall award "reasonable attorney's fees and costs of court incurred by the physician or health care provider." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(1). In its September 26, 2011 order, the trial court noted Drs. Messner, Erwin, and Taylor, Dallas Diagnostic, and Baylor Hospital waived recovery of attorneys' fees for defense of this lawsuit in the trial court and in any appellate court.

Under section 74.351 of the civil practice and remedies code, any person who brings suit asserting a health care liability claim must, within 120 days of filing the original petition, provide an expert report for each physician or health care provider against whom a claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *see also Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51 (Tex. 2002). When a plaintiff sues more than one defendant in connection with a health care liability claim, the expert report must set forth the standard of care applicable to each defendant, show how that defendant's conduct failed to meet that standard, and explain the causal relationship between each defendant's individual acts and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011); *Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 638 (Tex. App—Dallas 2003, pet. denied). If a report omits any of these statutory elements of section 74.351(r)(6), it cannot be a good faith effort. *Palacios*, 46 S.W.3d at 879.

A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the trial court's inquiry is limited to the four corners of the report. *Eichelberger v. Mulvehill*, 198 S.W.3d 487, 490 (Tex. App.—Dallas 2006, pet. denied) (citing *Palacios*, 46 S.W.3d

at 878)). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Leland v. Brandal,* 257 S.W.3d 204, 206–07 (Tex. 2008); *Palacios,* 46 S.W.3d at 879.

An expert report need not marshal all the plaintiff's proof. *Wright,* 79 S.W.3d at 52. However, it must do more than merely state the expert's conclusions about the standard of care, breach, and causation; it must explain the basis of the expert's statements and link his conclusions to the facts. *Id.; Quinones v. Pin,* 298 S.W.3d 806, 810 (Tex. App.—Dallas 2009, no pet.). The report must contain sufficiently specific information to demonstrate causation beyond mere conjecture. *See Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex. App.—Fort Worth 2007, no pet.). Thus, courts have reasoned that an expert report that describes causation in terms of mere possibilities does not accomplish the purpose of providing "a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52; *see also Quinones,* 298 S.W.3d at 815–16.

*Appellants' Experts' Reports*

Appellants served appellees with two reports from Dr. Kress and a report from Dr. Sadun. Appellees challenged the reports and moved to dismiss appellants' health care liability claims.

In Dr. Kress's July 8, 2010 expert report, he states his opinions are given "within a reasonable degree of medical certainty or probability." He indicates that he is familiar with the standard for delivery of healthcare in a critical or intensive care setting, "including the care provided by surgeons whose patients are in that setting, critical care specialists, nurses, physical therapists, and other health care providers and allied health care providers who practice or participate in the care of patients in a critical care setting." His first report includes the following:

On post operative day one (7/16/08) Mr. Fortner noted visual changes. A physical therapist initial evaluation noted a "requirement for assistance secondary to visual impairment" at 3:04 PM. A nurse's note by Karla Jones on 7/16/08 at 18:10 notes "visual field disturbances . . . ." At 18:40, Ms. Jones notified Dr. Erwin, and at 19:20, Dr. Messner was notified. The first consultative evaluation of Mr. Fortner's visual complaints was a neurology consultation the next day (7/17/08) at 9:51 AM. . . . Pulmonary/Critical care consultant (note dated 7/17/08) stated "Opthal consult if indicated". An ophthalmology consult was not obtained, however, until 7/17/08 at 17:38, approximately one day after the patient was initially noted to have acute visual changes. The patient was ultimately noted to have anterior ischemic optic neuropathy with permanent blindness in both eyes.

Whenever a patient experiences visual changes, this is a medical emergency that requires immediate and appropriate evaluation. Time is critical. It is my opinion that the potential for blindness in a post coronary bypass graft patient, particularly one who has experienced recent hypotension and anemia, is a foreseeable event. In a specialty heart hospital, the foreseeability of such an event would be greater than elsewhere, thus one would expect health care providers practicing in such a setting, including physicians, nurses and physical therapists, to be trained in identifying and responding to the signs and symptoms suggestive of potential vision loss.

It is my opinion that the applicable standard of care in the critical setting which Mr. Fortner was in, following his surgery—a critical care unit in a specialty heart hospital— is such that immediate ophthalmologic, as well as neurologic, consultation was required for Mr. Fortner upon first notice to any member of a the [sic] health care team, of any acute change in the patient's vision, and should have been obtained emergently. As a cardiothoracic surgeon, Dr. Messner should be familiar with and able to foresee the potential for ischemic injury to the brain and/or eyes given a past medical history of hypertension and peri-operative anemia and hypotension. As critical care physicians generally, and especially in a specialty heart hospital, Drs. Erwin, Taylor, and the PULM/CC PHYSICIAN (if other than Drs. Taylor and Erwin) should be familiar with and able to foresee the potential for ischemic injury to the brain and/or eyes given a past medical history of hypertension and peri-operative anemia and hypotension. Nurses and physical therapists in such a setting should be trained to immediately procure immediate physician attention for any patient who complains of visual changes.

It is my opinion that the applicable standard of care was breached by the physical therapist employed at [Baylor Hospital], when she merely noted Mr. Fortner's acute visual change on 7/16/08, but apparently did nothing further, including communicating the condition to a physician so that immediate evaluation could occur. It is my opinion that Drs. Messner, Erwin, and Taylor and the PULM/CC PHYSICIAN (if other than Drs. Taylor and Erwin) each breached the applicable standard of care by not obtaining immediate ophthalmologic, as well as neurologic, consultation, and by not providing any appropriate therapy or intervention to address Mr. Fortner's visual changes, upon being notified of the same. It is my opinion that [Baylor Hospital] breached the applicable standard of care by apparently failing to

provide training to its staff, including but not necessarily limited to its physical therapy providers, about the urgent need for intervention in the form of specialty consultative care, and when and how to access the same, in the event of a foreseeable emergent visual condition such as Mr. Fortner's.

Dr. Kress opines that each of the breaches of the standard of care by Baylor Hospital, Baylor Hospital's employees, Dr. Messner, Dr. Erwin, and Dr. Taylor proximately caused or contributed to causation of Mr. Fortner's injury.

In his December 29, 2010 supplemental report, Dr. Kress notes the consulting ophthalmologist recommended correction of Mr. Fortner's hypotension and anemia. "However, by that time, the patient was noted to have blindness in both eyes which ultimately was determined to be anterior ischemic optic neuropathy." Dr. Kress opines that Baylor Hospital breached the applicable standard of care by either failing to have or enforce policies and procedures, or standing orders, directing practitioners, nurses, and other health care providers about when and how to access specialty consultative care in the event of a foreseeable visual condition such as Mr. Fortner's. He further opines the applicable standard of care was breached by a physical therapist employed by Baylor Hospital when she noted Mr. Fortner's acute visual change but did not communicate the condition to a physician so that immediate evaluation could occur and by a nurse at Baylor Hospital when she delayed communication to a physician about Mr. Fortner's visual changes after she was aware of the changes. With regard to Drs. Messner, Erwin, and Taylor, Dr. Kress states the physicians did not act to treat Mr. Fortner's anemia or hypotension during "the recognized window of opportunity" on July 16, 2008, when Mr. Fortner's acute visual changes were first noted. Dr. Kress specifically refers to the December 20, 2010 report of Dr. Sadun as describing the "window of opportunity" during which corrective action must be taken. Dr. Kress opines the breaches of the standards of care by Baylor Hospital, Baylor Hospital's employees, and Drs. Messner, Erwin, and Taylor proximately caused or contributed to causation of Mr. Fortner's injury, and states causation

is more fully described in Dr. Sadun's report.

In his December 20, 2010 report, Dr. Sadun states he "speak[s] to the issue of causation." Dr. Sadun notes that by postoperative day two, Mr. Fortner's drop in hematocrit and hemoglobin "meant that he had essentially lost half of his red blood cell volume," and shortly after surgery, Mr. Fortner's blood pressure was about half of his preoperative blood pressure. In his report, Dr. Sadun states:

> By postoperative day one, Mr. Fortner noted decreased vision in the right eye and then a day or two later in the left eye. . . . When he was seen by ophthalmology July 17, 2008 at about 5:30 in the evening the diagnosis was anterior ischemic optic neuropathy with a complete loss of vision in both eyes.
>
> There are two types of anterior ischemic neuropathy. . . . Bilateral loss of vision in conjunction with this type of surgery and at such a profound extent is almost certainly the rare second form of anterior ischemic optic neuropathy. . . . The mechanism of this type of post-surgical anterior ischemic optic neuropathy can . . . be termed . . . shock induced optic neuropathy.

According to Dr. Sadun, shock induced optic neuropathy, a "watershed infarct (a type of stroke)," is due to a combination of factors that decreases the supply of oxygen in a "more diffuse fashion" than other types of infarcts caused by blood vessel blockage or bleeding. He states that in circumstances where the patient becomes very anemic (low hematocrit) or experiences drops in blood pressure for a "reasonably long duration," shock induced optic neuropathy can occur. According to Dr. Sadun, the amount of time it takes the optic nerve to undergo "irreversible loss" following a lack of adequate blood supply "is in the order of a hundred minutes," although there are a number of factors that "might make this longer." According to Dr. Sadun:

> Shock induced neuropathy occurs during but also after surgery. It is not uncommon for it to occur one or two days later.
>
> Once shock induced optic atrophy occurs there is probably only a narrow window of opportunity to reverse it. This is best done by blood transfusions, which increase the hematocrit or hemoglobin. There may be circumstances where raising the blood pressure is also useful.

–10–

In noting four units of blood to raise the hematocrit were not given to Mr. Fortner until the afternoon and evening of July 17 and the afternoons of July 19 and 20, Dr. Sadun states in his report:

> This delay in transfusion probably represented the last opportunity to reverse the visual loss for Mr. Fortner. Failure to do so at this time was inordinate and unfortunate. Indeed, the request for an ophthalmology consultation did result in a belated recommendation for blood transfusion (and to take efforts to maintain blood pressure). Specifically, Dr. Lu, at about 17:38 on the 17th and Dr. Brochner, the next day, expressly recommended efforts to raise the blood pressure and reverse the anemia as reflected by the low hemoglobin and hematocrit. This delay in boosting Mr. Fortner's blood pressure, and more particularly in correcting his severe anemia, nothwithstanding his having severe hypotension and anemia, while also complaining of visual disturbance, was, in my opinion, a breach in the standard of care.

In Dr. Sadun's opinion, Mr. Fortner's loss of vision was a consequence of a "drop in blood count as expressed by hemoglobin and hematocrit (anemia), possibly complicated by drops in blood pressure." With regard to causation, Dr. Sadun opines there was a failure by Baylor Hospital and Drs. Messner, Erwin, and Taylor to obtain timely consultation by an ophthalmologist and a resulting failure to timely commence transfusion therapy and blood pressure elevation. "In concert, this led to Mr. Fortner's permanent blindness."

*Direct Liability Claims Against Baylor Hospital and Drs. Messner, Erwin, and Taylor*

Appellants' expert reports discuss the medical necessity of timely and appropriate evaluation when a post-surgical coronary artery bypass patient in critical care experiences vision impairment, particularly when the symptom arises in conjunction with recent hypotension and anemia. According to the expert report of Dr. Kress, Drs. Messner, Erwin, and Taylor should be familiar with, and able to foresee, the potential for "ischemic injury to the brain and/or eyes given [Mr. Fortner's] past medical history of hypertension and peri-operative anemia and hypotension." In addition, Dr. Kress opined that nurses and physical therapists at a specialty heart hospital, such as Baylor Hospital, should be trained to immediately procure physician attention for any patient who complains of vision changes. The expert reports of Drs. Kress and Sadun make clear that the "watershed" post-surgical

anterior ischemic optic neuropathy experienced by Mr. Fortner required timely response and intervention, and opine that the breaches of the applicable standards of care by appellees resulted in untimely and ineffective responses to Mr. Fortner's complaints about vision impairment and, consequently, Mr. Fortner's permanent blindness.

Dr. Messner argues that the expert reports of Drs. Kress and Sadun are inadequate with respect to causation because they require the trial court to make impermissible inferences concerning the timing of the opening and closing of the "window of opportunity" to take corrective action, whether Dr. Messner became aware of Mr. Fortner's vision disturbance within the "window of opportunity," and whether Dr. Messner could have arranged for effective treatment by an ophthalmologist within the "window of opportunity." A similar argument is made by Drs. Erwin and Taylor. Baylor Hospital argues appellants' experts did not "explain how [Baylor Hospital's] alleged breach in failing to have policies and procedures caused Mr. Fortner's permanent blindness."

Appellees demand too much from the expert report required by section 74.351. One of the fundamental purposes of the expert report requirement in section 74.351 is to deter frivolous claims. *Palacios*, 46 S.W.3d at 878 (Legislature has determined that filing expert report that does not evidence good faith effort to comply with definition of expert report means claim is either frivolous or, at best, has been brought prematurely). An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial. *Wright*, 79 S.W.3d at 52; *Fagadau v. Wenkstern*, 311 S.W.3d 132, 138 (Tex. App.—Dallas 2010, no pet). Indeed, section 74.351 does not require that an expert report anticipate and rebut all possible defensive theories that may ultimately be presented to the trial court, and the fact a plaintiff may not prove causation at trial does not mean an expert report was inadequate. *See Fagadau*, 311 S.W.3d at 139. Instead, the expert report must represent a good faith effort to provide a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that

–12–

failure and the claimed injury. *Palacios*, 46 S.W.3d at 878. The expert report must contain sufficiently specific information to demonstrate causation beyond mere conjecture. *Fagadau*, 311 S.W.3d at 138. Further, the expert must explain the basis of his statements and link his conclusions to the facts. *Wright*, 79 S.W.3d at 52; *Quinones*, 298 S.W.3d at 810.

Here, within the four corners of the expert reports, Drs. Kress and Sadun collectively opine that Baylor Hospital employees and Drs. Messner, Erwin, and Taylor comprised the team responsible for Mr. Fortner's post-surgical critical care. The expert reports collectively indicate that, while Mr. Fortner's post-surgical complaints of vision impairment should have been recognized by these physicians and health care providers as problematic in light of Mr. Fortner's hypotension and anemia, Mr. Fortner did not receive timely attention and treatment, including timely consultation by an ophthalmologist, blood transfusion therapy, and measures to elevate blood pressure, which caused the optic nerve of each of Mr. Fortner's eyes to be deprived of an adequate blood supply over a period of time sufficient to result in permanent blindness in both eyes. The expert reports identify each physician and health care provider against which direct liability claims are asserted, including Baylor Hospital, and discuss how the provider breached the applicable standard of care and caused or contributed to causation of Mr. Fornter's injury. With regard to Baylor Hospital, Dr. Kress opines that the hospital breached the applicable standard of care by either failing to have or enforce policies and procedures, or standing orders, directing practitioners, nurses, and other health care providers about when and how to access specialty consultative care in the event of a foreseeable visual condition such as Mr. Fortner's, resulting in untimely health care intervention and Mr. Fortner's injury.

The expert reports in this case represent a good faith effort to provide a fair summary of the experts' opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between the failure and the claimed injury. Collectively,

the expert reports contain sufficient information to inform appellees of the specific conduct that appellants have called into question and to provide a basis for the trial court to conclude the claims have merit. *See Brandal*, 257 S.W.3d at 206–07; *Palacios*, 46 S.W.3d at 879. Therefore, we conclude the trial court abused its discretion in dismissing appellants' direct liability claims against Baylor Hospital and Drs. Messner, Erwin, and Taylor. We resolve appellants' sole issue in their favor in part.

### Direct Liability Claims Against Dallas Diagnostic, HeartFirst, and Texas Clinic

In their First Amended Petition, appellants allege the "entity" appellees—Dallas Diagnostic, HeartFirst, Texas Clinic, and Baylor Hospital—were negligent. In their brief, appellants affirmatively state they are "not pursuing claims of direct negligence, as opposed to vicarious liability, against any of the entity [appellees] other than [Baylor Hospital]." Therefore, we conclude the trial court did not abuse its discretion by dismissing with prejudice appellants' direct liability claims of negligence, as opposed to vicarious liability, asserted against Dallas Diagnostic, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' direct liability negligence claims against Dallas Diagnostic, HeartFirst, and Texas Clinic, and we resolve appellants' sole issue against them in part.

### Vicarious Liability Claims Against
### Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic

Appellants allege Dallas Diagnostic is vicariously liable for the negligence of its members, Drs. Erwin and Taylor. Appellants likewise allege HeartFirst and Texas Clinic are vicariously liable for the negligence of their employee, Dr. Messner. Finally, appellants allege Baylor Hospital is vicariously liable for the negligence of its employees, agents, ostensible agents and representatives.

With regard to appellants' theories of vicarious liability asserted against Dallas Diagnostic, HeartFirst, Texas Clinic, and Baylor Hospital, "when a health care liability claim involves a

–14–

vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious liability theory. And if any liability theory has been adequately covered, the entire case may proceed." *Certified EMS, Inc. d/b/a CPNS Staffing v. Potts*, No. 11-0517, 2013 WL 561471, at *6 (Tex. Feb. 15, 2013). *See also, TTHR Ltd. P'Ship v. Moreno*, No. 11-0630 (Tex. Apr. 5, 2013), *available at* http://www.supreme.courts.state.tx.us/historical/2013/apr/110630.pdf. Having concluded appellants' experts' reports represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6) with regard to appellants' direct liability claims against Drs. Erwin, Taylor, and Messner, those reports are sufficient to support appellants' vicarious liability claims against Dallas Diagnostic, HeartFirst, and Texas Clinic.

Dr. Kress expresses the following opinions regarding the negligence of Baylor Hospital employees: a physical therapist was negligent when she noted Mr. Fortner's acute visual change but did not communicate the condition to a physician so that immediate evaluation could occur, and Nurse Jones was negligent by delaying communication to a physician about Mr. Fortner's visual changes after she was aware of the changes. Baylor Hospital argues the expert reports lack sufficient specificity on causation because the experts did not opine that any breach by hospital employees "occurred within the 100-minute window or the 'narrow window of opportunity,' during which the visual loss allegedly could have been reversed."

As discussed above, the expert reports opine Mr. Fortner's post-surgical complaints of vision impairment should have been recognized by the health care providers and physicians providing post-surgical critical care, including the Baylor Hospital employees, and the failure to provide timely attention and treatment caused the injuries to the optic nerves in each of Mr. Fortner's eyes, resulting in total blindness. With regard to appellants' clam of the vicarious liability of Baylor Hospital for the negligence of its employees, appellants' experts' reports represent an objective good faith effort

to comply with the definition of an expert report in section 74.351(r)(6), and those reports are sufficient to support appellants' vicarious liability claim against Baylor Hospital.

Therefore, we conclude the trial court erred in dismissing appellants' vicarious liability claims against Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic. We resolve appellants' sole issue in their favor in part.

## Informed Consent Claims

In their First Amended Petition, appellants allege neither Dr. Messner nor Baylor Hospital disclosed to, or informed, Mr. Fortner that vision loss was a potential risk or hazard associated with the anticipated surgical or post-surgical procedures. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (West 2011) (in health care liability claims based on lack of informed consent, "the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent"); *Greenberg v. Gillen*, 257 S.W.3d 281, 282–83 (Tex. App.—Dallas 2008, pet. dismissed) (in cases alleging lack of informed consent, there are two separate parts to causation analysis: whether a reasonable person could have been influenced to decide to give or withhold consent by being informed of risks or hazards that were not disclosed, and whether injury complained of was caused in fact by the undisclosed risk). In their brief, appellants state, "Although [appellants] also asserted a lack of informed consent as part of their negligence claims against [Baylor Hospital], Dr. Messner, and his employers [HeartFirst, and Texas Clinic], the court dismissed the informed consent allegation by bench order." At the March 2011 hearing, appellants' counsel stated he understood the informed consent claims would be "taken off the table" unless appellants provided an expert report addressing those claims, and he acknowledged there was no expert report addressing those claims. On appeal, appellants have not asserted the trial court erred by dismissing their direct liability claims of lack of informed consent against Dr. Messner or Baylor Hospital and their claims

of vicarious liability for lack of informed consent against Dr. Messner's employers, HeartFirst or Texas Clinic. Therefore, we conclude the trial court did not abuse its discretion by dismissing with prejudice appellants' claims of lack of informed consent against Dr. Messner, Baylor Hospital, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' claims of lack of informed consent, and we resolve appellants' sole issue against them in part.

## Conclusion

We affirm the trial court's dismissal of appellants' claims of lack of informed consent against Baylor Hospital, Dr. Messner, HeartFirst, and Texas Clinic. We affirm the trial court's dismissal of appellants' direct liability claims against Dallas Diagnostic, HeartFirst, and Texas Clinic. We reverse the trial court's dismissal of appellants' direct liability claims against Baylor Hospital, Dr. Messner, Dr. Erwin, and Dr. Taylor and appellants' vicarious liability claims against Baylor Hospital, Dallas Diagnostic, HeartFirst, and Texas Clinic. We remand this cause to the trial court for further proceedings.

ROBERT M. FILLMORE
JUSTICE

110971F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

RONALD FORTNER AND PAM FORTNER, Appellants

No. 05-11-00971-CV     V.

HOSPITAL OF THE SOUTHWEST, LLP D/B/A THE HEART HOSPITAL BAYLOR PLANO; GARY E. ERWIN, JR., M.D.; JEFF TAYLOR, M.D.; GREGORY MESSNER, D.O.; HEALTH TEXAS PROVIDER NETWORK D/B/A DALLAS DIAGNOSTIC ASSOCIATION–PLANO; JAMES E. RELLAS, M.D., P.A. D/B/A HEARTFIRST CARDIOLOGY CENTER; AND MEDICAL EDGE HEALTHCARE GROUP, P.A. D/B/A THE TEXAS CLINIC AT PRESTONWOOD, Appellees

Appeal from the 101st Judicial District Court of Dallas County, Texas. (Tr.Ct.No. 10-02994-E).
Opinion delivered by Justice Fillmore, Justices FitzGerald and Richter participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment dismissing with prejudice appellants' direct liability negligence claims against Health Texas Provider Network d/b/a Dallas Diagnostic Association–Plano; James E. Rellas, M.D., P.A. d/b/a HeartFirst Cardiology Center; and Medical Edge Healthcare Group, P.A. d/b/a The Texas Clinic at Prestonwood. We **AFFIRM** the trial court's judgment dismissing with prejudice appellants' lack of informed consent claims against Hospital of the Southwest, LLP d/b/a The Heart Hospital Baylor Plano; Gregory Messner, D.O; James E. Rellas, M.D., P.A. d/b/a HeartFirst Cardiology Center; and Medical Edge Healthcare Group, P.A. d/b/a The Texas Clinic at Prestonwood. We **REVERSE** the trial court's judgment dismissing with prejudice appellants' direct liability claims against Hospital of the Southwest, LLP d/b/a The Heart Hospital Baylor Plano; Gary E. Erwin, Jr., M.D.; Jeff Taylor, M.D.; and Gregory Messner, D.O. We **REVERSE** the trial court's judgment dismissing with prejudice appellants' vicarious liability claims against Hospital of the Southwest, LLP d/b/a The Heart Hospital Baylor Plano; Health Texas Provider Network d/b/a Dallas Diagnostic Association–Plano; James E. Rellas, M.D., P.A. d/b/a HeartFirst Cardiology Center; and Medical Edge Healthcare Group, P.A. d/b/a The Texas Clinic at Prestonwood. We **REMAND** this cause to the trial court for further proceedings. We **ORDER** that each party bear its own costs of this appeal.

Judgment entered April 5, 2013.

ROBERT M. FILLMORE
JUSTICE