**AFFIRM; and Opinion Filed June 12, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00153-CV

**NEXION HEALTH AT GARLAND, INC. D/B/A PLEASANT VALLEY HEALTHCARE AND REHABILITATION CENTER, Appellant**

**V.**

**CHRISTINE TOWNSEND, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE ON BEHALF OF THE ESTATE OF ROSALINDA SAGER, Appellee**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-06933**

## MEMORANDUM OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Fillmore

Following back surgery, Rosalinda Sager was admitted to Nexion Health at Garland, Inc. d/b/a/ Pleasant Valley Healthcare and Rehabilitation Center (Nexion). Her condition subsequently deteriorated to the point that she was transferred to Baylor Medical Center at Garland (Baylor), where she died. Christine Townsend, individually and on behalf of Sager's estate, filed a health care liability suit against Nexion and Sager's treating physician while Sager was a resident at Nexion.

Pursuant to chapter 74 of the Texas Civil Practice and Remedies Code, Townsend offered the expert report of Dr. Luis Gonzalez in support of her claims. Nexion filed objections to the report and a motion to dismiss Townsend's claims against it. The trial court overruled Nexion's objections and denied its motion to dismiss. In this interlocutory appeal, Nexion argues the trial

court abused its discretion by denying the motion to dismiss because Dr. Gonzalez's report fails to adequately address any breach of the applicable standard of care by Nexion and fails to sufficiently identify and describe causation. We affirm the trial court's judgment.

## Background

### *Factual Allegations*

Sager, who was sixty-nine years old, was admitted to Nexion on October 26, 2012 for rehabilitation following back surgery. Upon admission, Sager was assessed as having a "high fall risk" based on her history of multiple falls, chair-bound status, poor vision, current medications, and predisposing conditions. The admission assessment noted that Sager required two-person assists with transfer and extensive assistance from the staff for her activities of daily living. Physical and occupational therapy assessments further documented the conditions that placed Sager at a high risk of falling, but noted she had "good rehab potential."

Testing on November 28, 2012, indicated Sager had deep vein thrombosis (DVT) in her bilateral lower extremities. Sager's physician ordered bed rest for forty-eight hours and prescribed Coumadin and Lovenox to treat the DVT and prevent complications such as pulmonary embolism. Both of these drugs are anticoagulants that prevent the blood from clotting. The physician also ordered that Sager's International Normalized Ratio (INR) levels be checked every Monday and Friday to monitor the effects of the Coumadin and Lovenox.

On November 30, 2012, Sager was noted to have slight edema and redness of her right thigh. Sager's physician ordered that Sager continue to receive the Coumadin and Lovenox. That same day, tests showed Sager had an INR of 1.18, which was slightly below the therapeutic range of 2.00 to 3.00. She also had a prothrombin time, which is a measure of how long it takes a person's blood to clot, of 13.9 seconds, which was above the normal range of 9.8 to 12.9 seconds. A blood test performed on Monday, December 3, 2012, indicated Sager's INR was

within the normal range, but her prothrombin time was 29.6 seconds. Even though Sager's INR was within the normal range, Sager continued to receive Lovenox injections. Despite Sager's physician's orders that Sager's INR be checked every Monday and Friday, Sager's INR was not checked again during her stay at Nexion.

A nurse's note on December 6, 2012 stated that Sager "tried to go back to bed by herself," was unable to balance, and "sat down on the floor." Sager's physician was notified and x-rays were ordered to evaluate Sager's lower back. Approximately seven hours later, a nurse noted there were no delayed injuries from the fall and the x-rays showed no signs of fracture.

The following day, a nurse noted there was no delayed injuries from the fall, but Sager was restless and had a knot on her lower right buttock with purple bruising covering the area. On December 8, 2012, a nurse noted Sager had a hemotomal bump on her buttocks, but no bleeding. Later that day, Sager was described as pale with labored breathing and was transferred to Baylor.

Upon admission to Baylor, Sager was assessed with tachycardia, anemia, extreme weakness, and altered mental status. Additional testing revealed she was suffering from traumatic retroperitoneal hematoma secondary to anticoagulation. She had an INR of 4.9 and a prothrombin time of 51.6 seconds. She was noted as having severe abdominal pain and bruising as well as large bruises on her buttocks, upper legs, pubis, and perineum that were "caused by trauma." Sager was admitted to the intensive care unit and was intubated, sedated, and placed on mechanical ventilation. She received multiple blood transfusions and fresh frozen plasma in an attempt to correct her coagulopathy.

On December 9, 2012, an attending physician at Baylor described Sager as being "over anti-coagulated." She was also diagnosed with acute renal failure. She experienced failure of multiple organs and died on December 11, 2012. The "death summary" from Baylor indicated

Sager died from respiratory failure, retroperitoneal bleeding, acute renal failure, and multiple organ failure. A subsequent autopsy included findings describing a history of Coumadin for DVT of the lower legs; blunt force injuries with contusions, retroperitoneal hemorrhage, and body fluid in the abdomen; and a history of falling. The autopsy concluded Sager died from blunt force injury associated with Coumadin therapy.

*Procedural History*

On June 30, 2014, Townsend sued both Nexion and Sager's treating physician while she was a resident at Nexion, asserting their negligence caused Sager's death. Attached to Townsend's petition was an expert report from Dr. Gonzalez. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2014). Nexion objected to the sufficiency of the report and filed a motion to dismiss. Townsend filed a motion to overrule Nexion's objections. She also responded to Nexion's motion to dismiss, arguing the motion was not properly before the trial court because Nexion had not waited 120 days before seeking to dismiss the case. The trial court overruled Nexion's objections to Dr. Gonzalez's report and found the report complied with the requirements of chapter 74 of the civil practice and remedies code. Nexion indicated it still wished to proceed on its motion to dismiss and, more than 120 days after Nexion filed its answer, the trial court denied Nexion's motion to dismiss. Nexion timely filed this interlocutory appeal from the trial court's denial of the motion to dismiss.

**Standard of Review**

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Van Ness v. ETMC First Physicians*, No. 14-0353, 2015 WL 1870051, at *1 (Tex. Apr. 24, 2015) (per curiam). We must defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo. *Id.* A trial court abuses its discretion if it acts without reference to

–4–

guiding rules or principles. *Id.* A trial court has no discretion in determining what the law is or in applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.).

## Applicable Law

Chapter 74 of the civil practice and remedies code governs health care liability claims. *Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.*, 269 S.W.3d 314, 316 n.3 (Tex. App.—Dallas 2008, no pet.). A person who brings suit asserting a health care liability claim must, within 120 days after the date each defendant's original answer is filed, provide an expert report, along with a curriculum vitae of each expert listed in the report, for each physician or health care provider against whom a liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2014). An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards of care, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *see also TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51 (Tex. 2002) (per curiam).

A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of "expert report" in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Loaisiga*, 379 S.W.3d at 260;

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) (decided under section 13.01 of the predecessor statute, the Medical Liability and Insurance Improvement Act, previously codified at article 4590i of the Texas Revised Civil Statutes). If a report omits any of the statutory elements of section 74.351(r)(6), it cannot be a good faith effort. *Palacios*, 46 S.W.3d at 879.

In determining whether the expert report meets a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Sanchez*, 378 S.W.3d at 588; *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.—Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878). "We may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.). Rather, the expert must explain, based on facts set out in the report, how and why the breach caused the injury. *Van Ness*, 2015 WL 1870051, at *1. A bare expert opinion that the breach caused the injury is insufficient. *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010); *Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.—Dallas 2012, no pet.) (report is deficient if it merely states expert's conclusion about standard of care, breach, and causation).

The purpose of the expert report requirement, however, is to deter frivolous claims, not to dispose of claims regardless of their merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). Although the report must include the expert's opinion on each of the elements identified in the statute, it is not required to marshal all the plaintiff's proof. *Palacios*, 46 S.W.3d at 878; *see also Loaisiga*, 379 S.W.3d at 257–58. Because the expert report requirement "is a threshold mechanism to dispose of claims lacking merit," *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013), the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Palacios*, 46 S.W.3d at 879.

Further, the report is not required to address every alleged liability theory to make the defendant aware of the conduct at issue. *Potts*, 392 S.W.3d at 630. "If a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous." *Id.* at 631.

Specifically as to the requirement the expert report address the causal relationship between the health care provider's failure to meet the applicable standard of care and the injury, there are no "magical words" required to establish causation. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53. Rather, a causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). An expert may show causation by explaining a chain of events that begins with a defendant health care provider's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.). The expert report must contain sufficiently specific information to demonstrate causation beyond conjecture, *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 379 (Tex. App.—Dallas 2013, no pet.), and the mere provision of some insight into the plaintiff's claims does not address causation adequately. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52. "While a claimant is not required to conclusively prove her case through a preliminary expert report, the report may not merely state conclusions about any of the elements." *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.). The expert report must explain the basis for the causation opinions by linking the expert's conclusions to the alleged breach. *Hollingsworth*, 353 S.W.3d at 523 n.12. When assessing the sufficiency of an expert's opinion on causation, we view the opinion in the context of the entire report. *Ortiz*, 378 S.W.3d at 671.

**Analysis**

In three issues, Nexion asserts the trial court abused its discretion by failing to dismiss Townsend's claims because Dr. Gonzalez's report did not establish either that Nexion breached the applicable standard of care or the causal relationship between the alleged harm and Nexion's conduct. In her petition, Townsend alleged Nexion breached the applicable standards of care by failing to maintain adequate supervision, staffing, and assistance to prevent avoidable falls; failing to develop and maintain a care plan consistent with Sager's needs and history; failing to properly analyze accidents and conduct a sufficient post-fall evaluation; failing to know the rationale for and the effects of medications that are being administered; and failing to timely transfer Sager to the hospital. In his report, Dr. Gonzalez discussed each of these theories of liability based on actions or omissions by Nexion that can be generally divided into two categories: (1) failing to prevent Sager from falling on December 6, 2012, and (2) failing to properly monitor and transfer Sager to Baylor after her fall. We will address the second category first.

Under the "Causation" section of the expert report, Dr. Gonzalez explained that Coumadin is most commonly used to treat blood clots by preventing a patient's blood from clotting. It can have serious side effects or interactions that put patients at risk for dangerous bleeding. Lovenox is also an anticoagulant, but is typically used for short durations. The two drugs are used in conjunction with each other because Lovenox begins working immediately while it takes several days for Coumadin to become effective against clotting. Lovenox is used to prevent clots until the Coumadin results in therapeutic levels of the INR. Once a patient's INR is in the appropriate range, the patient can stop taking Lovenox. Because both Coumadin and Lovenox have similar effects of anticoagulation, the risk of bleeding is increased when they

are used together.  A patient receiving Coumadin and Lovenox has a greater risk of injury from falling than does a patient who is not receiving these medications.

In order to optimize the therapeutic benefit of Coumadin therapy and minimize or prevent the potential for adverse consequences, a patient's INR levels must be monitored with a frequency determined by clinical circumstances, duration of Coumadin use, and stability of monitoring results.  According to Dr. Gonzalez, one of the most serious risks associated with anticoagulant therapy is hemorrhage in tissue or organs.  Further, multiple medication interactions with Coumadin can result in significantly increased INR levels associated with life-threatening bleeding.  Therefore, periodic monitoring of a patient's INR is essential, and a physician should be notified immediately of any changes in the patient's status while taking the medication.  Special risk patients, such as the elderly, require increased observation while taking Coumadin due to their sensitivity to drugs, possible drug interactions and/or side effects, greater risk of falling, and comorbidities.  A patient taking both Coumadin and other blood-thinning drugs may have an increased risk of dangerous bleeding.  Retroperitoneal bleeding is one of the most serious and potentially lethal complications of anticoagulation therapy.

Dr. Gonzalez's report indicates a retroperitoneal hematoma is an accumulation of blood in the muscles and tissues behind the abdominal wall cavity.  The bleeding can occur spontaneously in patients with a bleeding disorder or who are taking anticoagulants, have undergone a medical procedure, or have suffered trauma. Patients taking an anticoagulant are at risk of a retroperitoneal hematoma because "the medication allows the blood from an internal injury to bleed more easily into the retroperitoneal space."  Blunt trauma may result in injury and internal bleeding.  Retroperitoneal hematoma caused by blunt trauma usually results from physical trauma near the lower back.  A strong enough impact can rupture blood vessels and other soft tissues in the area.  If there is uncontrolled bleeding, the patient may suffer from

significant blood loss, hemorrhagic shock, and death. Dr. Gonzalez opined that Sager's fall resulted in blunt force injuries, which led to retroperitoneal hematoma secondary to anticoagulation.

Dr. Gonzalez then specifically addressed Nexion's conduct following Sager's fall:

> In terms of reasonable medical probability, had the staff performed an appropriate post-fall evaluation following Ms. Sager's accident on 12-6-12, the nursing staff would have properly assessed her condition, including frequently monitoring her vital signs and conducting a thorough neurological exam. In terms of reasonable medical probability, had the nursing staff known the rationale for and the effects of Coumadin and Lovenox, they would have been aware of the risks associated with the medication, especially after a fall and would have known Ms. Sager was at risk for potential complications following her incident. In terms of reasonable medical probability, had proper assessments been performed, nurses would have discovered Ms. Sager's change in condition following the fall, and they would have been able to notify the attending physician immediately. Relaying critical information to a physician regarding Ms. Sager's status, more likely than not, would have resulted in her transfer to the hospital for treatment in time to save her life.

Nexion complains Dr. Gonzalez's causation opinion did not establish its conduct following Sager's fall caused her injury because he failed to explain (1) how or why vital sign testing or a neurological exam would lead to a faster diagnosis and/or hospital transfer, or (2) why a fast diagnosis and/or hospital transfer would lead to a different or better result (i.e., what additional treatment from a faster diagnosis would have changed the result).

Nexion, however, ignores statements by Dr. Gonzalez in other sections of his report. *See Columbia N. Hills Hosp., Subsidiary, L.P. v. Tucker*, No. 05-14-00056-CV, 2014 WL 7247401, at *3 (Tex. App.—Dallas Dec. 22, 2014, no pet.) (mem. op.) (reviewing sections of the report other than causation opinion to determine whether report "supplies the missing 'how and why' of causation"). In the "Breaches of Standards of Care" section of Dr. Gonzalez's report, he first opined that nurses have a duty to ensure all physicians' orders are carried out properly. He stated:

–10–

The monitoring of diagnostic test results is essential in order to: (i) ascertain the individual's response to treatment and care, including progress or lack of progress toward a therapeutic goal; (ii) detect any complications or adverse consequences of the condition or of the treatments; and (iii) support decisions about modifying, discontinuing, or continuing any intervention. On Friday, 11-30-12, the nurses at [Nexion] properly carried out these orders, and Ms. Sager had an INR of 1.18, which was slightly below the therapeutic range of 2.00–3.00. Another blood test was performed the following Monday, 12-3-12, and results indicated that Ms. Sager's INR was therapeutic at 2.6. However [Nexion's] nursing staff failed to test Ms. Sager's INR levels on Friday, 12-7-12, as required by [the physician's] orders. By failing to test Ms. Sager's blood levels, the nursing staff failed to properly monitor Ms. Sager's response to anticoagulation therapy. Monitoring a resident's response to any medication is essential to evaluate the ongoing benefits as well as risks of various medications.

(Citations omitted). According to Dr. Gonzalez:

It is critical for a patient receiving anticoagulation therapy to have his or her INR checked frequently, especially when the therapy is first initiated. These lab tests are used to adjust a patient's dose of Coumadin. The more elevated a patient's INR, the longer it will take for his or her blood to clot, which thereby increases the risk of bleeding. Monitoring for adverse consequences such as bleeding involves ongoing vigilance as well as consistent and objective collection of information by the facility and its nursing staff. By failing to test the [sic] Ms. Sager's INR levels after 12-3-12, the nursing staff at [Nexion] not only breached the standard of care, but they failed to ensure the safety and well being of Ms. Sager. The nurses at [Nexion] failed to monitor Ms. Sager's INR levels, even after she sustained a severe fall on 12-6-12. By not monitoring Ms. Sager's INR as ordered, the nursing staff increased Ms. Sager's risk of injuries. . . . Furthermore, the patient continued to receive Lovenox despite a therapeutic INR on 12/3/12. This further increased the risk of bleeding particularly after a fall.

Gonzalez also opined that Nexion and its nurses had a duty to properly analyze Sager's fall and conduct an appropriate post-fall evaluation. One of the actions Nexion and its nurses were required to take following Sager's fall was to ascertain if there were injuries and provide treatment as necessary. The nurses were required to provide a detailed description of how Sager fell, her immediate symptoms following the incident, any changes in status, any follow-up treatment and/or interventions provided, and her response to those treatments and/or interventions. According to Dr. Gonzalez, this duty was breached by the failure to take Sager's vital signs immediately following the fall; the failure to monitor Sager's vital signs throughout

–11–

the day for any changes in her condition; the failure to conduct a neurological exam to evaluate changes in Sager's cognition levels, alertness, or behavior; and the failure to note all actual and potential complications of the fall. If Nexion had "documented the fact that Ms. Sager was receiving anticoagulant therapy with Coumadin, and that she could have potentially fallen hard enough to cause blunt trauma and internal bleeding, the proper precautions could have been taken to assess her for signs of hemorrhage and provide immediate treatment as necessary."

In Dr. Gonzalez's opinion, the knot to Sager's right buttock and the fact the entire area was described as "bruised, purple from yesterday's fall," should have indicated to the nursing staff on December 7, 2012, that Sager sustained some type of trauma to her lower back/buttocks when she fell and should have alerted them to monitor Sager for signs and symptoms of internal bleeding. Gonzalez noted that, after Sager fell on December 6, 2012, her condition gradually began to decline. On December 7, 2012, she showed signs of "disorganized thinking" and her pulse rate was ninety beats per minute, nine beats a minute higher than on December 6, 2012. Gonzalez concluded:

> This change in condition should have been conveyed to her physician by the nursing staff. When Ms. Sager began to have symptoms indicative of hemorrhagic shock, such as confusion, labored breathing, increased pain, and rapid heartbeat, a physician should have been consulted immediately so that Ms. Sager could have been transferred to the hospital for treatment.
>
> By the time she was admitted to Baylor Medical Center at Garland, she was suffering from retroperitoneal bleeding secondary to anticoagulation, anemia, hemorrhagic shock, and respiratory failure. Ms. Sager required multiple blood transfusions to correct her coagulopathy, large doses of IV diuretics for renal failure, and mechanical ventilation. By the time Ms. Sager received these treatments, it was too late, and they proved unsuccessful. As a result, Ms. Sager's condition continued to deteriorate. The nurses at [Nexion] should have conveyed her change in condition immediately to a physician so that Ms. Sager could have been transferred before her condition became too severe. This lack of urgency on behalf of the nursing staff delayed critical treatment that more likely than not, would have saved her life. Failing to timely transfer her led to her hemorrhagic shock, retroperitoneal bleed, acute respiratory distress, and eventual death. Because [Nexion] and its staff waited several days to transfer Ms. Sager to the

hospital after she sustained a severe fall while receiving Coumadin therapy, the standard of care was breached.

(Citations omitted).

When an expert report states the breach of the standard of care by a health care provider is the failure to monitor, observe, test, or evaluate, the report must explain what action the health care provider would have taken in response to the data obtained from the monitoring, testing, and evaluating that should have been performed, "including passing that data to another physician or health care provider who could take action that would have altered the patient's outcome." *Patterson v. Ortiz*, 412 S.W.3d, 833, 839–40 (Tex. App.—Dallas 2013, no pet.). Dr. Gonzalez, in his report, set out a chain of events linking specific breaches of the applicable standard of care to the ultimate injury. Dr. Gonzalez noted the Coumadin and Lovenox that Sager was receiving increased her risk of injury and bleeding from a fall. In Dr. Gonzalez's opinion, Sager's fall and resulting blunt force injuries led to retroperitoneal hematoma secondary to anticoagulation. After Sager's fall, Nexion failed to follow physician's orders to check Sager's INR levels. Sager's INR level on the day after her fall would have provided information about the length of time it would take Sager's blood to clot and whether she was at increased risk of bleeding. Further, Nexion failed to properly monitor Sager following the fall or to note that she was receiving anticoagulants which increased her risk of bleeding internally. Sager began exhibiting symptoms indicative of hemorrhagic shock on the day after she fell, but Nexion failed to timely notify Sager's physician. The failure to immediately notify Sager's physician of Sager's condition delayed critical treatment that, more likely than not, would have saved her life. *See id.* at 839 ("The 'treatment' the report states [the health care provider] should have provided was to admit [the patient] to a hospital. The report explains how the action of admitting [the patient] to the hospital would have prevented his death by stating that at the hospital, [the patient] would have received 'early, aggressive treatment [that], more likely than not, would have saved his

–13–

life.'"). By the time Sager received treatment, including blood transfusions to correct her coagulopathy, large doses of IV diuretics for renal failure, and mechanical ventilation, it was too late and the treatments were unsuccessful.[1]

Given these opinions in the expert report of Dr. Gonzalez, the trial court could have reasonably determined the report adequately identified the manner in which the care rendered by Nexion failed to meet the applicable standard of care and explained "the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Patterson*, 412 S.W.3d at 838–40 (expert report that stated (1) health care provider's failure to perform certain tests, examinations, and assessments resulted in an inaccurate diagnosis, and (2) if provider had performed tests, correctly diagnosed patient, and determined patient required hospitalization, then patient could have received early, aggressive treatment that, more likely than not, would have saved his life was sufficient to explain why provider's conduct caused patient's death); *Acedo v. Springs*, No. 05-12-00454-CV, 2013 WL 3477348, at *5 (Tex. App.—Dallas July 9, 2013, pet. denied) (mem. op.);[2] *Adeyemi v. Guerrero*, 329 S.W.3d 241, 245 (Tex. App.—Dallas 2010, no pet.) (in health care liability case based on delay in identifying brain bleed after a fall, expert report that stated health care provider should have ordered CT scan or had patient examined by neurologist and delay significantly increased chances that patient's condition would worsen sufficiently addressed "element of causation by specifically stating what [health care provider] should have done and what happened because she

---

[1] We note that, to the extent Nexion may be arguing the report is deficient for not specifying the precise treatment Sager would have received if she had been admitted to the hospital earlier, it has cited no authority requiring that the report specify the actions that should or would have been taken by any health care provider other than Nexion. *See Patterson*, 412 S.W.3d at 843. It is sufficient that the report states Nexion should have contacted Sager's physician so that she could be hospitalized in time for treatment to be effective. *Id*. at 842–43.

[2] In *Acedo*, we concluded an expert report adequately linked conduct to the alleged harm where report stated: (1) the nurses' failure to initiate the chain of command and call for help proximately caused the alleged injury and death; (2) if the chain of command had been initiated and help had been called, additional personnel would have been available to provide assistance and input and, as a result, a particular drug would not have been administered, the patient would not have been paralyzed, and the patient would not have suffered hypoxic brain injury; (3) even if the drug had been administered, additional specialized personnel and equipment would have ensured the patient was successfully intubated after he was paralyzed; and (4) the injury to the patient's brain worsened over time until an airway was re-established. 2013 WL 3477348, at *5.

failed to do it"). Accordingly, the trial court did not abuse its discretion by determining the report was a good faith effort to comply with the statutory requirements and by denying Nexion's motion to dismiss. *See Van Ness*, 2015 WL 1870051, at *4; *Covenant Health Sys. v. McMillan*, 446 S.W.3d 861, 868–69 (Tex. App.—Amarillo 2014, no pet.).

Because we have determined the report adequately addressed both breach of the applicable standard of care and causation as to Nexion's conduct after Sager's fall, we need not address whether it adequately addressed either breach of the standard of care or causation as to Nexion's conduct before the fall. *Potts*, 392 S.W.3d at 631 (report that satisfies statutory requirements as to only one theory of liability entitles claimant to proceed with suit against health care provider). We resolve Nexion's three issues against it and affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

150153F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NEXION HEALTH AT GARLAND, INC.
D/B/A PLEASANT VALLEY
HEALTHCARE AND REHABILITATION
CENTER, Appellant

No. 05-15-00153-CV        V.

CHRISTINE TOWNSEND,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE ON BEHALF OF
THE ESTATE OF ROSALINDA SAGER,
Appellee

On Appeal from the 116th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-14-06933.
Opinion delivered by Justice Fillmore,
Justices Myers and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Christine Townsend, Individually and as Personal Representative on Behalf of the Estate of Rosalinda Sager recover her costs of this appeal from appellant Nexion Healthcare at Garland, Inc. d/b/a Pleasant Valley Healthcare and Rehabilitation Center.

Judgment entered this 12th day of June, 2015.