**AFFIRMED; Opinion Filed July 26, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01261-CV

**BLAKE SMITH, M.D.; BAYLOR SCOTT & WHITE HEALTH SYSTEM; BAYLOR REGIONAL MEDICAL CENTER AT GRAPEVINE; TEXAS HEART HOSPITAL OF THE SOUTHWEST LLP D/B/A THE HEART HOSPITAL BAYLOR PLANO; AND RICHARD FEINGOLD, D.O., Appellants**

**V.**

**HARRY JOHNSON AND LYNN JOHNSON, Appellees**

On Appeal from the 192nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-16-01488

## MEMORANDUM OPINION

Before Justices Fillmore, Whitehill, and Boatright
Opinion by Justice Fillmore

Harry Johnson (Johnson) suffered cardiac arrest and was transported to Baylor Regional Medical Center at Grapevine (Baylor Grapevine). At Baylor Grapevine, Johnson was resuscitated and stabilized, however impaired blood flow to Johnson's lower extremities was not detected until later in the day. After a failed attempt to transfer Johnson to Texas Heart Hospital of the Southwest LLP d/b/a The Heart Hospital at Baylor Plano (Heart Hospital), Johnson was taken to surgery at Baylor Grapevine in order to address the impaired blood flow to his lower extremities. Johnson's left leg could not be saved during that surgery and was later amputated. Johnson and his wife, Lynn Johnson, (appellees) sued Blake Smith, M.D., Richard Feingold, D.O., Baylor Scott & White Health System (Baylor Scott & White), Baylor Grapevine, and

Heart Hospital (collectively appellants) for damages allegedly sustained by Johnson as a result of the negligent acts or omissions of appellants.

Appellees served appellants with expert reports as required by section 74.351 of the civil practice and remedies code. Appellants objected to various aspects of those reports and moved to dismiss the case. The trial court entered orders overruling appellants' objections to the expert reports and denying their motions to dismiss, and this interlocutory appeal was taken challenging those trial court orders. In three issues, Dr. Smith contends the expert report of Patrick Roughneen, M.D., did not constitute a good faith report because his opinions on causation are conclusory, his opinions on standards of care provide no information on specific conduct alleged to have been negligent, and he is not qualified to render standard-of-care opinions concerning the care provided by Dr. Smith. In a single issue, Baylor Scott & White, Baylor Grapevine, and Heart Hospital (collectively "the Baylor appellants") and Dr. Feingold assert the expert reports of Dr. Roughneen and J. Kevin Moore, M.H.A., J.D., are deficient because their opinions on causation are conclusory and speculative.

For reasons explained in this opinion, we affirm the trial court's orders overruling appellants' objections to the expert reports and denying their motions to dismiss.

## Background[1]

### *Appellees' Factual Allegations*

On October 6, 2014, Johnson suffered a blood clot in his descending aorta that blocked blood flow to his lower extremities. The blood clot also caused Johnson to suffer cardiac arrest, for which he was transported to Baylor Grapevine. At Baylor Grapevine, Dr. Smith treated Johnson. Johnson was resuscitated and stabilized with an acceptable heart rate, heart rhythm,

---

[1] Given the procedural posture of this case, we draw the background facts from the allegations against appellants in the Plaintiffs' Second Amended Original Petition and Third Amended Original Petition, the live pleadings at the times of the trial court's orders.

and blood pressure. Impaired blood circulation to Johnson's legs was not timely recognized or acted upon by Dr. Smith. Dr. Smith contacted Dr. Feingold regarding a cardiology consultation for Johnson. At the time he examined Johnson, Dr. Feingold failed to recognize or act upon impaired blood circulation to Johnson's legs.

Hours passed between the time Johnson was stabilized and the time impaired blood circulation to Johnson's legs was treated. At approximately 11:50 a.m., Baylor Grapevine Emergency Department staff placed a telephone call to Dr. Roughneen, a vascular surgeon, to request a consultation concerning Johnson's condition. During that phone conversation, Dr. Roughneen accepted Johnson as a patient, instructed the Emergency Department staff to obtain a CT angiogram, and informed the Emergency Department staff he would come to the hospital as soon as possible to assume care of Johnson. At some point shortly after that phone call, Dr. Roughneen was informed that a decision had been made to transfer Johnson from Baylor Grapevine to Heart Hospital and that Dr. Roughneen was no longer responsible for Johnson's care. Baylor Grapevine concurred in a decision of Drs. Smith and Feingold to transfer Johnson to Heart Hospital. Heart Hospital initially accepted the transfer knowing that Baylor Grapevine had the capability to treat Johnson.

At approximately 2:00 p.m., Dr. Roughneen was informed the transfer of Johnson to Heart Hospital was not "going to be accomplished" because Heart Hospital did not have an available hospital bed for Johnson. At that point, Dr. Roughneen agreed again to assume care of Johnson. Dr. Roughneen went to Baylor Grapevine and performed emergency surgery to restore blood circulation to Johnson's lower extremities. Due to the delay between the time Johnson's impaired blood circulation "should have been or actually was recognized" and the time of surgery, Johnson lost his left leg and ultimately underwent a complete hindquarter amputation.

*Appellees' Theories of Liability*

Appellees allege Dr. Smith and Dr. Feingold were negligent in the medical examination, diagnosis, and treatment of Johnson by failing to timely recognize and act upon impaired blood circulation in Johnson's legs, failing to timely seek a vascular consultation, seeking or permitting the consultation by Dr. Roughneen to be cancelled, and attempting to transfer Johnson from Baylor Grapevine to Heart Hospital.

Appellees allege Baylor Scott & White and Baylor Grapevine were negligent in failing to have policies, procedures, or protocols in place to prevent transfer of a patient from Baylor Grapevine to Heart Hospital when the necessary "medical/surgical" services were available at Baylor Grapevine. Appellees also allege Baylor Scott & White and Baylor Grapevine were negligent under the doctrine of *respondeat superior* for their actual or apparent agents or employees at Baylor Grapevine who participated in the attempted transfer of Johnson to Heart Hospital. Appellees allege Heart Hospital was negligent in failing to have policies, procedures, or protocols in place to prevent transfer of a patient from an "outside" healthcare facility to Heart Hospital when the necessary "medical/surgical" services were available at the "outside" healthcare facility and/or when Heart Hospital had no available hospital bed for the patient.

Appellees allege the cancellation of Dr. Roughneen's initial consultation and the attempted transfer of Johnson to Heart Hospital "foreseeably caused a needless delay" in Johnson's surgery and caused them harm and damages.

Appellees further allege Baylor Scott & White, Baylor Grapevine, and Heart Hospital violated 42 U.S.C.A. § 1395dd, entitled "Examination and Treatment for Emergency Medical

Conditions and Women in Labor,"[2] and "other related federal regulations," causing them harm and damages.[3]

*Procedural History*

Pursuant to section 74.351 of the civil practice and remedies code, appellees served appellants with expert reports prepared by Dr. Roughneen, a board certified thoracic surgeon, and Moore, who has a master's degree in health administration and a law degree, in support of their claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2016). Appellants filed objections challenging the adequacy of Dr. Roughneen's and Moore's expert reports. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Dr. Smith objected to Dr. Roughneen's qualifications to render an opinion regarding the applicable standards of care[4] as well as his actual opinions concerning both the standards of care and causation. The Baylor appellants and Dr. Feingold objected to Dr. Roughneen's and Moore's qualifications to render standard-of-care opinions. They also objected to Dr. Roughneen's expert report because it failed to sufficiently identify the applicable standards of care, show how the standards of care were breached, and explain the causal relationship between the breach of the standards of care and the alleged injury, and to Moore's expert report because it failed to explain the causal relationship between the breach of the applicable standards of care and the alleged injury.

---

[2] Subsection (c) of 42 U.S.C.A. § 1395dd contains restrictions on hospital transfer of an individual who has an emergency condition. *See* 42 U.S.C.A. § 1395dd(c) (West 2012).

[3] The Plaintiffs' Second Amended Original Petition was the live pleading at the time an October 3, 2016 order was signed overruling appellants' objections to Dr. Roughneen's expert report and denying their motion to dismiss appellees' health care liability claims against them. The Plaintiffs' Third Amended Original Petition was the live pleading at the time the trial court signed a November 9, 2016 order denying the Baylor appellants' and Dr. Feingold's motion to dismiss appellees' health care liability claims against them. The Third Amended Original Petition added HealthTexas Provider Network as a defendant; HealthTexas Provider Network is not a party to this interlocutory appeal. The Third Amended Original Petition also asserted additional claims of civil conspiracy against Baylor Scott & White, Baylor Grapevine, Heart Hospital, and Dr. Feingold in which appellees allege those defendants civilly conspired to "illegally steer patients away from not-for-profit Baylor Health System facilities and [to] for-profit Baylor facilities as well as to HealthTexas Provider Network employed physicians and away from non-employed physicians," and those defendants "attempted to execute the object of their conspiracy with Harry Johnson." Appellees alleged the "illegal arrangement is still being practiced today" and "[f]or this reason," Baylor Scott & White, Baylor Grapevine, Heart Hospital, and Dr. Feingold were grossly negligent and liable for exemplary damages.

[4] According to Dr. Smith's appellate brief, the trial court and appellees' counsel agreed Moore was not rendering opinions in his expert report concerning Dr. Smith, and on appeal, appellees have not disputed Dr. Smith's representation to that effect.

Although not in the appellate record, the parties do not dispute that on August 15, 2016, the trial court heard the objections to Dr. Roughneen's expert report, sustained objections to the report,[5] and granted appellees a thirty-day extension in which to attempt to cure deficiencies. *See id*. § 74.351(c), (*l*).[6] Within the thirty-day extension period, appellees served appellants with an amended expert report of Dr. Roughneen.

Dr. Smith objected to Dr. Roughneen's amended expert report on the bases that Dr. Roughneen is not qualified to opine regarding the applicable standards of care, and the amended report is unreliable because it conflicts with the causation opinion contained in his original report.[7] Dr. Smith moved for dismissal of appellees' claims against him. The Baylor appellants and Dr. Feingold also objected to Dr. Roughneen's amended report on the bases that Dr. Roughneen is not qualified to render standard-of-care opinions and his amended report fails to sufficiently identify the applicable standards of care, show how the standards of care were breached, and explain the causal relationship between the breach of the standards of care and the alleged injury. On October 3, 2016, the trial court signed an order denying appellants' objections to Dr. Roughneen's amended report and denying appellants' motions to dismiss appellees' claims against them.

On October 25, 2016, the Baylor appellants and Dr. Feingold filed a motion to dismiss appellees' claims against them to "procedurally perfect their right" to seek appellate review of the trial court's ruling on the sufficiency of Dr. Roughneen's amended report. *See* § 74.351(b). In their motion to dismiss, the Baylor appellants and Dr. Feingold incorporated their prior

---

[5] Although not explicitly addressed in the trial court's August 15, 2016 order, the parties to this appeal do not contest that the trial court implicitly overruled the Baylor appellants' and Dr. Feingold's objections to Moore's expert report.

[6] In their appellate brief, appellees state they do not dispute Dr. Smith's statement that the trial court sustained his objections to Dr. Roughneen's original expert report or that Dr. Roughneen served an amended second report in response to the trial court's order.

[7] See *HealthSouth Corp. v. Searcy*, 228 S.W.3d 907, 909 (Tex. App.—Dallas 2007, no pet.) (because amended filing supplants previously filed document, second amended expert report was document before trial court and appellate court); *Cornejo v. Hilgers*, 446 S.W.3d 113, 124 n.11 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (amended expert report served after thirty-day extension granted by trial court supersedes any initial report filed by the claimant).

objections that Dr. Roughneen is not qualified to render standard-of-care opinions and his amended report fails to sufficiently identify the applicable standards of care, show how the standards of care were breached, and explain the causal relationship between the breach of the standards of care and the alleged injury. On November 9, 2016, the trial court signed an order denying the Baylor appellants' and Dr. Feingold's motion to dismiss appellees' claims against them.

Dr. Smith invoked the jurisdiction of this Court by filing his interlocutory appeal of the trial court's order overruling his objections to Dr. Roughneen's amended expert report and denying his motion to dismiss appellees' claims against him. *See id*. § 51.014(a)(9) (West Supp. 2016). The Baylor appellants and Dr. Feingold thereafter filed their interlocutory appeal of the trial court's order overruling their objections to appellees' expert reports and denying their motions to dismiss appellees' claims against them. *See id*.

**Standard of Review**

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 791 (Tex. App.—Dallas 2009, no pet.). We must defer to the trial court's factual determinations if they are supported by the evidence, but review its legal determinations de novo. *Van Ness*, 461 S.W.3d at 142. A trial court has no discretion in determining what the law is or in applying the law to the facts. *Sanchez v. Martin*, 378 S.W.3d 581, 587 (Tex. App.—Dallas 2012, no pet.). We apply the same standard in reviewing a trial court's determination in a health care liability case that a person submitting an expert report is qualified. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (West 2011). A

trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

## Applicable Law

The Texas Medical Liability Act (TMLA) contained in Chapter 74 of the civil practice and remedies code governs health care liability claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–.507 (West 2011 & Supp. 2016); *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, No. 15-0909, 2017 WL 2492003, at *1 (Tex. June 9, 2017); *see also Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.*, 269 S.W.3d 314, 316 n.3 (Tex. App.—Dallas 2008, no pet.). Any person who brings suit asserting a health care liability claim must, within 120 days after each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports for each physician or health care provider against whom a health care liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). An "expert report" is:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51 (Tex. 2002) (per curiam). When a plaintiff sues more than one defendant in connection with a health care liability claim, the expert report must set forth the standard of care applicable to each defendant, show how that defendant's conduct failed to meet that standard of care, and explain the causal relationship between each defendant's failure to meet the standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011).

A trial court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of "expert report" in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). To represent an objective good faith effort to comply with the statutory requirements of Chapter 74, the expert report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016); *see also Loaisiga*, 379 S.W.3d at 260. If a report omits any of the statutory elements of section 74.351(r)(6), it cannot be considered a good faith effort. *Sanchez*, 378 S.W.3d at 588.

In determining whether the expert report represents an objective good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Fortner v. Hosp. of the Sw, LLP*, 399 S.W.3d 373, 379 (Tex. App.—Dallas 2013, no pet.); *see also Jelinek*, 328 S.W.3d at 539 (to determine whether expert report complies with section 74.351, courts consider the information "found within the four corners of the expert report, which need not 'marshal all the plaintiff's proof' but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation") (quoting *Bowie Mem'l Hosp.*, 79 S.W.3d at 52)).[8] An expert report must do more than merely state the expert's conclusions about the standard of care, breach, and causation, *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Fortner*, 399 S.W.3d at 379; "the expert must explain the basis of his statements to link his conclusions to the facts." *Jelinek*, 328 S.W.3d at 539 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "We may not 'fill gaps' in an expert report by drawing inferences or guessing

---

[8] *See also Hickory Trail Hosp., L.P. v. Webb*, No. 05-16-00663-CV, 2017 WL 677828, *4 (Tex. App.—Dallas Feb. 21, 2017, no pet.) (mem. op.).

what the expert likely meant or intended." *Hollingsworth v. Springs*, 353 S.W.3d 506, 513 (Tex. App.—Dallas 2011, no pet.); *see also Fortner*, 399 S.W.3d at 379 (report must contain sufficiently specific information to demonstrate causation beyond mere conjecture).

**Appellees' Expert Reports**

*Dr. Roughneen's Amended Expert Report*

Summary of Johnson's Medical Care:

According to Dr. Roughneen, at 9:49 a.m. on October 6, 2014, Johnson was brought to Baylor Grapevine by emergency medical transport following a 9:28 a.m. 9-1-1 telephone call reporting a witnessed cardiac arrest. Johnson was "logged into" the Emergency Department at 9:53 a.m. Dr. Smith was the emergency physician who attended Johnson, while Dr. Feingold provided a cardiology consultation and Nilesh Dave, M.D. provided a pulmonary consultation. Medical treatment of Johnson in the Emergency Department "resulted in a return of a regular rate and rhythm of his heart as well as an acceptable blood pressure and hemodynamics." After a return of adequate hemodynamics, Johnson was considered medically stable.

Later in the morning, Johnson was found to have diminished or absent femoral pulses and circulation to his lower extremities. At approximately 11:50 a.m., Dr. Roughneen received a telephone call from the Baylor Grapevine Emergency Department "to address this issue." Dr. Roughneen accepted Johnson as a patient and told the Emergency Department staff to obtain a CT angiogram. Dr. Roughneen was assisting with another surgery at the time but was able to leave that surgery to attend to Johnson immediately, and he informed the Emergency Department staff that he would come to Baylor Grapevine as soon as possible to assume responsibility for Johnson's care. According to Dr. Roughneen, definitive surgical care for Johnson's condition was within the capability of Baylor Grapevine, and it was his intention to get Johnson into surgery to restore circulation to his lower extremities as soon as possible and within the six-hour

–10–

window in which restoration of blood flow to affected limbs must be accomplished in order to salvage the limbs.

Shortly after the initial phone conversation between Dr. Roughneen and the Baylor Grapevine Emergency Department, Dr. Roughneen was told a decision had been made to transfer Johnson from Baylor Grapevine to Heart Hospital. Dr. Roughneen was informed he was no longer "on the case." Baylor Grapevine concurred in a decision by Drs. Smith and Feingold to transfer Johnson to Heart Hospital. Heart Hospital accepted the transfer of Johnson.

The CT angiography was completed at 1:04 p.m. and indicated a "diffuse mural thrombus," or blood clot, was occluding blood flow below level L3 of Johnson's spine. At approximately 2:00 p.m., Dr. Roughneen was again contacted and informed the transfer of Johnson to Heart Hospital "was not going to be accomplished." Dr. Roughneen went immediately to Baylor Grapevine and assumed responsibility for Johnson's care. The surgery to restore blood circulation to Johnson's lower extremities began at 4:04 p.m. The damage caused by the "sequelae of ischemia," or deficient supply of blood, to Johnson's left leg resulted in the amputation of that extremity.

Applicable Standards of Care:

Dr. Roughneen indicated that, regardless of medical specialty, all physicians are trained to recognize vascular compromise by such symptoms as diminished or absent femoral pulses, cool or cold extremities, or mottled appearance of the patient's limbs. The applicable standards of care for treatment by Drs. Smith and Feingold of a patient such as Johnson are to timely recognize vascular compromise and quickly seek vascular surgery consultation, allow the vascular surgeon to complete his evaluation and treatment of the patient, and refrain from attempting to transfer the patient from a facility with vascular surgical services to an outside facility. Surgery to resolve Johnson's blood circulation occlusion was available at Baylor

–11–

Grapevine without undue delay. For this reason, the standard of care requires the patient to be treated at that facility by a vascular surgeon who has assumed care for the aortic blockage. The standards of care for physicians such as Drs. Smith and Feingold require them to refrain from making decisions regarding vascular surgery, such as decisions to terminate vascular surgery consultation and to transfer the patient to an outside facility.

Regarding transfer of a patient with vascular compromise, Dr. Roughneen stated that the applicable standards of care for a hospital such as Baylor Grapevine are to assure any patient transfer is to a facility capable of providing a higher level of care than can be provided at the originating facility and the patient will not suffer harm from the transfer. Additionally, the standards of care require a hospital with vascular surgery capability to refrain from approving a transfer to another facility "in the event of ongoing imminent limb ischemia." Such a transfer would not occur for the purpose of achieving a higher level of care and would create additional and unacceptable delay in the rendering of necessary treatment. Further, a decision to transfer in that circumstance is a decision that must be made by the appropriate vascular surgery specialty. The standard of care for a hospital such as Heart Hospital in accepting transfer of a patient such as Johnson is to determine whether the transferring facility has the capability to meet the surgical needs of the patient and, if so, to refrain from accepting such a patient because transfer will result in harmful and needless delay in providing definitive care to the patient.

Breaches of the Standards of Care:

Dr. Roughneen opined that Dr. Smith breached the applicable standards of care by failing to timely recognize vascular compromise and contact a vascular surgeon. Dr. Roughneen opined that Drs. Smith and Feingold breached the applicable standards of care because they engaged, without proper training, in vascular surgery decision-making by: (1) deciding to cancel, or allowing cancellation, of Dr. Roughneen's initial vascular surgery consultation; and (2)

–12–

attempting to transfer Johnson from Baylor Grapevine to Heart Hospital. According to Dr. Roughneen, definitive care for Johnson was readily available at Baylor Grapevine without undue delay, and transfer of Johnson should not have been attempted. Dr. Roughneen opined that Baylor Grapevine and Heart Hospital breached the applicable standard of care by "coordinating" transfer of Johnson to Heart Hospital, a facility that did not offer a higher level of care, and Heart Hospital breached the applicable standard of care by accepting Johnson as a patient despite not having availability for him, all of which caused a needless and harmful delay in definitive care.

Causation:

In his amended expert report, Dr. Roughneen indicated that blood flow to Johnson's lower extremities was physically obstructed by a blood clot in the descending aorta. There was a "window of opportunity" of about six hours for corrective action to restore blood flow before permanent tissue damage would occur. According to Dr. Roughneen, the longer the delay in surgical intervention, the worse the damage to the affected tissue. Had applicable standards of care been met, Dr. Smith would most likely have recognized vascular compromise no later than 11:00 a.m. and contacted a vascular surgeon for consultation, which likely would have resulted in "definitive" surgery to restore blood circulation by 12:30 p.m. and prevented loss of Johnson's left leg. Dr. Roughneen opined that had his initial vascular surgery consultation with Johnson, which was initiated at 11:50 a.m., not been cancelled by Drs. Smith and Feingold and an aborted attempt made by them to transfer Johnson to Heart Hospital, Johnson would have been taken to surgery by 1:45 p.m. and in reasonable medical probability Johnson's left leg would have been saved. Dr. Roughneen's amended expert report indicates that efforts of Baylor Grapevine and Heart Hospital to coordinate transfer of Johnson to Heart Hospital, a facility that did not offer a higher level of care than Baylor Grapevine, and Heart Hospital's initial acceptance of Johnson as a patient despite not having availability for him, caused needless and harmful delay in definitive

–13–

care that resulted in loss of Johnson's left leg. According to Dr. Roughneen, these delays in surgical intervention resulting from breaches in the applicable standards of care by Drs. Smith and Feingold and the Baylor appellants caused Johnson to receive surgical intervention about six and one half hours after a blood clot caused his cardiac arrest; thus, in reasonable medical probability, surgical intervention occurred outside the "window of opportunity" to save Johnson's left leg. Dr. Roughneen also stated in his amended expert report that the negligent acts and substandard care described in Moore's expert report were also a proximate cause of the loss of Johnson's left leg.

*Moore's Expert Report*

In his expert report, Moore concluded that as a direct result of the failure to adopt or follow proper hospital policies or procedures and failure to adhere to accreditation standards and requirements of federal and state law, Baylor Grapevine and Heart Hospital committed the following violations of the applicable standards of care: failure to assess, reassess, and follow standards related to managing patient flow, resulting in delayed treatment after charted symptoms and test results indicated an occlusion of the lower extremity vessels diagnosed shortly after Johnson's admission to Baylor Grapevine requiring immediate intervention; absence of coordination and continuity of care among consulting physicians, Emergency Department physicians, and Dr. Roughneen concering a vascular and thoracic surgeon consultation and the decision to transfer Johnson; Baylor Grapevine's initiation of a patient transfer for services that Baylor Grapevine could provide; and Heart Hospital's accepting this transfer before ascertaining it had no available bed and without medical certification in violation of "Baylor hospital policy" and applicable Emergency Medical Treatment and Labor Act[9] requirements.[10]

---

[9] *See* 42 U.S.C.A. §1395dd.

–14–

According to Moore, failure to assess, reassess, and act timely in addressing an occlusion in Johnson's lower extremity blood vessels diagnosed shortly after his Baylor Grapevine Emergency Department admission resulted in a critical delay in treatment. Despite charted findings, Johnson did not receive attendant consultation within a time frame necessary to prevent his condition from deteriorating to a point where amputation of his leg was required. Although a thoracic surgeon, Dr. Roughneen, was available to treat the patient and en route to Baylor Grapevine, a decision was made to transfer Johnson to Heart Hospital that resulted in delay in consultation by a thoracic and/or vascular surgeon. The decision to transfer Johnson was made despite Baylor Grapevine having both capacity and capability to perform the surgery Johnson required. Baylor Grapevine failed to assure a bed was available at Heart Hospital before cancelling Johnson's consultation with Dr. Roughneen. Heart Hospital accepted transfer of Johnson without medical certification justifying the transfer and before learning it had no available bed. Dr. Feingold acted in administrative capacities by directing hospital staff of Baylor Grapevine and Heart Hospital, respectively, and he did not ascertain bed availability at Heart Hospital before directing other Baylor Grapevine hospital staff to act on the transfer.

Moore's expert report recited factual information contained in the Baylor Grapevine medical records, beginning with Johnson's arrival at Baylor Grapevine at 9:53 a.m. An Emergency Department physician, Dr. Smith, initiated medical intervention and resuscitative

---

[10] Moore also opined Baylor Grapevine failed to treat Johnson's case as a sentinel event in violation of the Joint Commission on Accreditation of Healthcare Organizations (the JCAHO) standards related to patient safety. The JCAHO defines "sentinel event" as "an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof." *Anderson v. Rush-Copley Med. Ctr., Inc.*, 894 N.E.2d 827, 831 n.1 (Ill. App. Ct. 2008). "[T]he JCAHO accreditation standards provide hospitals with discretion to define what constitutes a 'sentinel event' and only certain sentinel events are subject to review by the Joint Commission. Further, even if a specific sentinel event is deemed reviewable, it does not *per se* result in the hospital submitting its root cause analysis and action plan [regarding the sentinel event] to the Joint Commission." *Lindon v. Kakavand*, No. 5:13-026-DCR, 2014 WL 4063821, at *2 (E.D. Ky. Aug. 15, 2014). Moore's opinion with regard to "treatment" of Johnson's case as a sentinel event necessarily involves an investigation of events that occurred after the treatment at issue. *See e.g.*, *Rodriguez v. CHRISTUS Spohn Health Sys.*, C.A. No. C-009-95, 2011 WL 3652189, at *3 (S.D. Tex. Aug. 18, 2011) (mem. op.) (by affidavit, chief medical officer explained that when suspected sentinel event has occurred, root cause analysis is performed to determine cause(s) of the event, whether conduct constitutes a sentinel event, and to formulate appropriate action plan for improving processes to prevent recurrences of such event).

–15–

efforts. Johnson's heart rate was stabilized and blood pressure restored. In an 11:20 a.m. medical record entry, Dr. Smith noted "cold extremities." The medical records included CT scan results indicating an "occlusion of the iliac vessels." The Emergency Department diagnoses for Johnson listed "arterial occlusion" as a primary medical concern.

In consultation with Drs. Feingold and Dave, Dr. Smith contacted Dr. Roughneen and requested that he "assess Johnson for surgical intervention." Dr. Roughneen responded at 11:52 a.m., accepted Johnson's case, and ordered a CT angiogram. Dr. Smith's 11:52 a.m. medical record entry states, "Dr. Roughneen is aware the [patient] has a cold leg." Johnson was seen by Dr. Sawroop Sandhu, practicing in the area of internal medicine, at 11:59 a.m., and Dr. Feingold was at Johnson's bedside at 12:06 p.m.

At 12:47 p.m., Dr. Michael O'Connor of the Baylor Grapevine Radiology Department reported "arterial blood flow was not visualized at the level of the trifurcation vessels concerning for extremely diminished blood flow versus occlusion," and the record reflects these results were discussed with Dr. Smith. At 1:00 p.m., a decision had been made to transfer Johnson to Heart Hospital. According to Moore, because this entry appears in the Baylor Grapevine Emergency Department nursing notes, Dr. Feingold apparently approved or must have taken steps to initiate the transfer process. At 1:14 p.m., Dr. Feingold contacted a heart surgeon at Heart Hospital to discuss Johnson's condition, and that heart surgeon agreed to accept Johnson as a transfer patient to Heart Hospital.

Dr. Roughneen telephoned the Baylor Grapevine Emergency Department while en route to Baylor Grapevine and was advised that his services would not be needed and Johnson was being transferred to Heart Hospital. However, at 1:41 p.m., Heart Hospital informed the Baylor Grapevine Emergency Department that it had no available beds and could not accept Johnson as a patient.

At 1:58 p.m., Dr. Smith returned a telephone call to the Baylor Grapevine Radiology Department and was advised by an interventional radiologist that "we need to call a thoracic surgeon." Dr. Roughneen was again telephoned and advised that Johnson would not be transferred to Heart Hospital. Dr. Roughneen arrived at the Emergency Department of Baylor Grapevine approximately thirty minutes after this telephone call and assessed Johnson. Dr. Roughneen charted Johnson's condition as follows: "pale, cold left lower extremity with tense musculature suggestive of compartment syndrome"; Johnson's "lower extremity is in impending jeopardy of being lost and I think that salvage surgery should be undertaken acutely"; and Johnson "is in immediate danger of losing the left extremity if surgical intervention is not undertaken." At 2:36 p.m., Dr. Smith's entry in Johnson's medical record states it was discovered that Johnson had an aorta infrarenal occlusion. Dr. Feingold's consultation notes were dictated at 3:27 p.m., stating there are no femoral or distal pulses felt in Johnson's right or left lower extremities and Johnson will require surgical intervention and emergent revascularization.

Moore's expert report indicates "[n]early [seven] hours passed between the time Mr. Johnson arrived at [Baylor Grapevine]" and an "assessment by a thoracic vascular surgeon was attained," and four to four and one half hours "passed from the time Johnson's occlusion was diagnosed until Dr. Roughneen saw him."[11] Dr. Roughneen took Johnson to surgery where he underwent an emergency procedure to attempt to salvage "the lower extremity." The following day Johnson underwent a second surgery to "complete an amputation of his left leg."

---

[11] We note the timeline in Moore's expert report indicates Johnson arrived at Baylor Grapevine at 9:53 a.m., Dr. Smith made a record of Johnson's "cold extremities" at 11:20 a.m., and Dr. Roughneen began his examination of Johnson about thirty minutes after receiving the 1:58 p.m. telephone call from Baylor Grapevine. Thus, Moore's timeline indicates about four and one-half to five hours elapsed between the time Johnson arrived at Baylor Grapevine and the time he was assessed by thoracic surgeon Dr. Roughneen, and about three hours elapsed between the time Johnson's "cold extremities" were noted and the time he was assessed by Dr. Roughneen.

**Dr. Smith's Appeal**

In three issues, Dr. Smith argues the trial court abused its discretion by overruling his objections to Dr. Roughneen's expert report.

*Qualifications to Render Opinions on Standard of Care*

In his third issue, Dr. Smith contends the trial court abused its discretion by overruling his objection that Dr. Roughneen is not qualified to render standard-of-care opinions with regard to care rendered by Dr. Smith. According to Dr. Smith, Dr. Roughneen is not qualified to render opinions concerning the standards of care relating to emergency department procedures. We review a trial court's determination as to the qualification of a witness as an expert for an abuse of discretion. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006) (quoting *Broders*, 924 S.W.2d at 151). We do not disturb the trial court's discretion absent clear abuse. *Id*. at 304 (quoting *Broders*, 924 S.W.2d at 151).

Section 74.401(a) of the TMLA sets out the criteria necessary for an expert to opine on a physician's standard of care and breach. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (West 2011). Not every licensed physician is always qualified to testify on every medical question. *Broders*, 924 S.W.2d at 152. Even so, the TMLA does not necessarily require that a plaintiff's expert and the defendant doctor be physicians practicing in the same field. A medical expert from one specialty may be qualified to provide an opinion relating to a different specialty "if he has practical knowledge of what is commonly done by doctors of a different specialty." *Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 541 (Tex. App.—El Paso 2014, no pet.).

In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arises or at the time testimony is given, the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim" and is "actively practicing medicine in rendering medical care

services relevant to the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c). The trial court should focus on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.3d at 153. The focus of the trial court should not necessarily be on the specialty of the medical expert. *Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 39 (Tex. App.—El Paso 2012, no pet.); *see Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003).

In his amended expert report, Dr. Roughneen, stated he is fully knowledgeable with regard to the diagnosis, care, and treatment of the conditions suffered by Johnson upon admission to Baylor Grapevine. Dr. Roughneen is a physician licensed to practice in Texas since 1992, certified by the American Board of Thoracic Surgery, and an associate professor of medicine at the University of Texas Medical Branch in Galveston, Texas, and he stated he is knowledgeable regarding the training physicians receive concerning recognition and diagnosis of vascular compromise in a patient. As his curriculum vitae reflects, he has co-authored an article specifically addressing recognition and management of obstructed pulmonary veins. In addition to medical training and experience in recognition and diagnosis of vascular compromise in a patient, whether that occurs in the emergency department of a health care facility or in another patient care setting, Dr. Roughneen indicates he has participated in the process of patient transfer and has also received training in that process through continuing medical education. The fact that Dr. Roughneen is not an emergency department physician does not disqualify him in this case from rendering opinions in an expert report served in accordance with section 74.351 on standards of care, breach of the standards of care, or causation. *See Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (neurologist qualified to testify as to whether cardiologist and emergency room physician breached standard of care in treating a

stroke; neurologist not precluded from giving opinion in area in which he had knowledge, skill, training, and experience and where subject of claim fell within his medical expertise). Accordingly, we cannot say the trial court abused its discretion in determining Dr. Roughneen's amended expert report and curriculum vitae sufficiently articulate his qualifications to render opinions regarding Dr. Smith's standards of care in this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c). We resolve Dr. Smith's third issue against him.

*Breach of Standards of Care*

In his second issue, Dr. Smith asserts Dr. Roughneen's opinions on standards of care provide no information on the specific conduct of Dr. Smith that is alleged to have been negligent. Specifically, Dr. Smith asserts Dr. Roughneen's report fails to set out his allegedly negligent conduct with respect to timely recognizing vascular compromise and seeking a vascular surgery consultation, cancelling the initial vascular surgery consultation, and attempting to transfer Johnson to another hospital. Dr. Smith also argues Dr. Roughneen's report contains no statement of factual information concerning the care and treatment he actually rendered.

In his amended expert report, Dr. Roughneen specifically states he reviewed Johnson's medical records, has personal knowledge of Johnson's medical care by virtue of his participation in it, and reviewed Moore's expert report. In particular, he relied on information concerning "negligent acts and substandard care" contained in Moore's expert report. Nothing in the TMLA prohibits Dr. Roughneen from relying on Moore's report in rendering his owns opinions regarding Dr. Smith's breach of the standard of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (claimant may satisfy any requirement of statute by providing reports of separate experts); *see also* TEX. R. EVID. 703 (stating an expert may base his opinion on facts and data that are not admissible in evidence if it is of a type reasonably relied on by experts in that particular field); *Nexion Healthcare Mgmt., Inc. v. Sosa*, No. 05-15-01083-CV, 2016 WL

1457069, at *4 (Tex. App.—Dallas Apr. 12, 2016, no pet.) (mem. op.) (in preparing his expert report, physician relied on nurse's expert report; on appeal, healthcare provider did not challenge nurse's report explaining standard of care or breach of standard of care; trial court and appellate court permitted to read physician's and nurse's reports together in determining whether claimant established causation); *Packard v. Guerra*, 252 S.W.3d 511, 532–33 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding physician experts could rely on expert opinion of attorney in formation of their opinions regarding standard of care and causation).

As to specific conduct supporting Dr. Roughneen's opinion that Dr. Smith breached applicable standards of care by failing to timely recognize vascular compromise and quickly seek a vascular surgery consultation, Dr. Roughneen's amended expert report indicates Johnson was "logged into" the Emergency Department at 9:53 a.m., and resuscitative efforts returned him to a stable condition. Johnson was found to have diminished or absent femoral pulses and circulation to his lower extremities and Dr. Smith noted "cold extremities" in an 11:20 a.m. medical record entry. In consultation with Drs. Feingold and Dave, Dr. Smith contacted Dr. Roughneen at approximately 11:50 a.m., "to assess Johnson for surgical intervention."

Dr. Roughneen opined Dr. Smith violated applicable standards of care by cancelling the initial vascular surgery consultation and attempting to transfer Johnson from Baylor Grapevine, a facility providing vascular surgical services, to Heart Hospital. As to specific conduct supporting this opinion, Dr. Roughneen's amended expert report indicates that Dr. Smith contacted Dr. Roughneen at 11:50 a.m., and Dr. Roughneen agreed to assess Johnson for surgical intervention. Despite Dr. Smith's charting Dr. Roughneen's awareness of Johnson's "cold leg" at 11:52 a.m., and Dr. Smith's awareness of the 12:47 p.m. report from the Baylor Grapevine Radiology Department regarding the lack of arterial blood flow at the trifurcation vessels as concern for "extremely diminished blood flow versus occlusion," at 1:00 p.m., a decision was

–21–

made by Drs. Smith and Feingold to transfer Johnson to Heart Hospital. The CT angiogram completed at 1:04 p.m. indicated a blood clot occluded blood flow below level L3 of Johnson's spine, and the Emergency Department diagnoses included "arterial occlusion." At 1:14 p.m., Dr. Feingold contacted a heart surgeon at Heart Hospital to discuss Johnson's condition, and that heart surgeon agreed to accept Johnson as a transfer patient to Heart Hospital. Dr. Roughneen telephoned the Baylor Grapevine Emergency Department while en route to the hospital and was advised that Drs. Smith and Feingold had decided, and Baylor Grapevine concurred, that Dr. Roughneen's services would not be needed and Johnson was being transferred to Heart Hospital.

Within the four corners of his amended expert report, Dr. Roughneen has made a good faith effort to articulate facts supporting his conclusions that Dr. Smith breached the applicable standards of care by failing to timely recognize vascular compromise and seek a vascular surgery consultation, cancelling the initial vascular surgery consultation, and attempting to transfer Johnson from Baylor Grapevine to Heart Hospital. *See Jelinek*, 328 S.W.3d at 539. We cannot conclude the trial court abused its discretion by overruling an objection by Dr. Smith that Dr. Roughneen's amended expert report fails to set out factual information regarding treatment rendered by Dr. Smith and specific conduct of Dr. Smith that is alleged to have been negligent. We resolve Dr. Smith's second issue against him.

*Causation*

In his first issue, Dr. Smith contends Dr. Roughneen's causation opinions are conclusory because his expert report fails to include medical facts upon which he relies to form the opinion that delays caused by Dr. Smith resulted in loss of Johnson's leg. Dr. Smith notes that he did not cause Johnson's aortic occlusion, and he could not have performed the surgery necessary to establish blood flow to Johnson's legs. Dr. Smith argues that any causal link must demonstrate his actions were a substantial factor in the inability to restore blood flow to Johnson's legs, and

–22–

that causal link is not demonstrated by Dr. Roughneen's expert report because (1) the report does not provide information on how the aortic occlusion occurred, when it occurred, how quickly it occurred, or why it occurred; and (2) there is a complete lack of information in Dr. Roughneen's report concerning the care that Dr. Smith provided during the alleged "window of opportunity" to take corrective action and the amount of delay attributable to Dr. Smith's care.

One of the fundamental purposes of the expert report requirement in section 74.351 is to deter frivolous claims. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (Legislature has determined that filing expert report that does not evidence good faith effort to comply with definition of expert report means claim is either frivolous or, at best, has been brought prematurely). An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial. *Wright*, 79 S.W.3d at 52; *Fortner*, 399 S.W.3d at 383. Indeed, section 74.351 does not require than at expert anticipate and rebut all possible defensive theories that may ultimately be presented to the trial court, and the fact a plaintiff may not prove causation at trial does not mean an expert report was inadequate. *Fortner*, 399 S.W.3d at 383. Instead, the expert report must represent a good faith effort to provide a fair summary of the expert's opinions about the causal relationship between the failure to meet the standard of care and the claimed injury. *Palacios*, 46 S.W.3d at 878. The expert report must contain sufficiently specific information to demonstrate causation beyond mere conjecture, and the expert must explain the basis of his statements and link his conclusions to the facts. *Fortner*, 399 S.W.3d at 383.

"In showing how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven[.]" *Zamarripa*, 2017 WL 2492003, at *4. Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id*. (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109,

–23–

113 (Tex. 2013) (per curiam)). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission, the harm would not have occurred. *Id*. (quoting *Goss*, 392 S.W.3d at 113). "An expert must explain, based on facts set out in the report, how and why the breach caused the injury." *Van Ness*, 461 S.W.3d at 142. An expert may show causation by explaining a chain of events that begins with a defendant health care provider's negligence and ends in injury to the plaintiff. *See Mitchell v. Satyu*, No. 05-14-00479-CV, 2015 WL 3765771, at *8 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.).

According to Dr. Roughneen's amended expert report, blood flow to Johnson's lower extremities was obstructed by a blood clot that most likely caused Johnson's cardiac arrest shortly before a 9-1-1 emergency call at 9:28 a.m. Johnson arrived at Baylor Grapevine at 9:49 a.m., and was "logged into" the Emergency Department at 9:53 a.m. Johnson was found to have diminished or absent femoral pulses and circulation to his lower extremities, and, in consultation with Drs. Feingold and Dave, Dr. Smith contacted Dr. Roughneen at approximately 11:50 a.m. "to assess Johnson for surgical intervention." Dr. Roughneen responded at 11:52 a.m. and was able to go immediately to Baylor Grapevine to attend to Johnson. By 1:00 p.m., a decision had been made by Drs. Smith and Feingold to transfer Johnson to Heart Hospital, and at 1:14 p.m., Dr. Feingold contacted a heart surgeon at Heart Hospital who agreed to accept Johnson as a transfer patient. Dr. Roughneen was informed while en route to Baylor Grapevine that Johnson was being transferred to Heart Hospital and that his services were no longer required. At 1:41 p.m., Heart Hospital informed the Emergency Department of Baylor Grapevine that it could not accept Johnson as a patient. At 1:58 p.m., Dr. Smith returned a telephone call to the Radiology Department and was advised by an interventional radiologist that "we need to call a thoracic surgeon." At approximately 2:00 p.m., Dr. Roughneen was again contacted regarding surgical

–24–

care of Johnson and informed the transfer of Johnson to Heart Hospital was not going to be accomplished. The surgical procedure to restore blood circulation to Johnson's lower extremities began at 4:04 p.m.

Dr. Roughneen opined there is a six-hour "window of opportunity" for corrective action to restore blood flow in order to prevent permanent tissue damage, and the longer the delay in surgical intervention during that window of opportunity, the worse the harm to the affected tissue. Dr. Roughneen stated that, had his consultation in response to the 11:50 a.m. contact from Dr. Smith not been cancelled, he would more likely than not have initiated surgical care of Johnson by 1:45 p.m. and restored blood circulation to Johnson's legs before permanent damage occurred, thus avoiding amputation of Johnson's leg. The attempted transfer of Johnson to Heart Hospital caused a two hour harmful delay and prevented surgical intervention until approximately six and one half hours after the blood clot caused Johnson's cardiac arrest, and the delayed surgery to restore circulation caused the "sequelae of ischemia," or deficient supply of blood, that necessitated amputation of Johnson's left leg.

Within the four corners of his amended expert report, Dr. Roughneen has made a good faith effort to provide a fair summary of his opinions concerning the six-hour "window of opportunity" to take corrective action restoring blood flow in this case and the adverse impact of unnecessary delay resulting from the aborted transfer of Johnson from Baylor Grapevine to Heart Hospital. Dr. Roughneen indicates in his amended report that Dr. Smith, in conjunction with Dr. Feingold, "violated applicable standards of care by cancelling the vascular surgery consultation and attempting to transfer the patient to an outside facility" and that had Dr. Smith, along with the Baylor appellants and Dr. Feingold, met the applicable standards of care, "Johnson would more likely than not have received definitive care timely and would most likely not have lost his left lower extremity." More specifically, Dr. Roughneen opined that "[b]ased on reasonable

–25–

medical probability, had applicable standards of care been met" by Dr. Smith, along with the Baylor appellants and Dr. Feingold, "the vascular surgery consultation with Patrick Roughneen, M.D. initiated about 11:50 a.m. on October 6, 2014 would not have been terminated and would have resulted in definitive surgical care initiated by approximately 1:45 p.m. on October 6, 2014. This in reasonable medical probability would have resulted in preservation of Johnson's left lower extremity because blood flow would have been restored to that limb before permanent damage occurred." The aborted attempt to transfer Johnson to Heart Hospital, which Dr. Roughneen attributes at least in part to the decision-making of Dr. Smith, caused a two hour delay in treatment and prevented surgical intervention until approximately six and one half hours after a blood clot caused Johnson's cardiac arrest, and the delay in surgery caused the "sequelae of ischemia," or deficiency in the supply of blood, that necessitated amputation of Johnson's left leg. The amended report contains sufficient information to explain "how and why" the cancellation of Johnson's initial vascular surgery consultation with Dr. Roughneen and the aborted attempt to transfer Johnson to Heart Hospital resulted in surgery occurring outside the "window of opportunity" for successful corrective action and caused Johnson's injury. These opinions are not conclusory.[12] *See Van Ness*, 461 S.W.3d at 143; *Fortner*, 399 S.W.3d at 383-84. Dr. Roughneen has explained the basis of his causation opinions by linking his conclusions to the facts of the case. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Fortner*, 399 S.W.3d at 379. Accordingly, we cannot conclude the trial court abused its discretion by overruling an objection by Dr. Smith that Dr. Roughneen's causation opinions are conclusory. We resolve Dr. Smith's first issue against him.

---

[12] Dr. Smith also argues that Dr. Roughneen's amended expert report contains causation opinions that are conclusory because he fails to explain "how and why" Dr. Smith's alleged untimely recognition of Johnson's vascular compromise and contact of a vascular surgeon caused Johnson's injury. Because we have determined Dr. Roughneen's amended expert report contains sufficient information regarding one theory of causation, we need not address other theories. *See Certified E.M.S., Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (expert report that satisfies required statutory elements of expert report "even as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider").

**The Baylor Appellants' and Dr. Feingold's Appeal**

In a single issue, the Baylor appellants and Dr. Feingold assert Dr. Roughneen's amended expert report and Moore's expert report are conclusory and speculative with regard to causation and therefore their reports are inadequate under section 74.351.[13]

*Adequacy of Moore's Expert Report Under Section 74.351*

In his expert report, Moore articulates "violations" of the standards of care applicable to Baylor Grapevine and Heart Hospital including (1) failure to assess, reassess, and follow standards related to "managing patient flow, resulting in delayed treatment after charted symptoms and test results indicated an occlusion of the lower extremity vessels requiring immediate intervention," (2) absence of coordination and continuity of care "among consulting physicians, ED physicians, and Dr. Roughneen on vascular and thoracic surgeon consultation and the decision to transfer Mr. Johnson," (3) initiation by Baylor Grapevine of a transfer of Johnson for medical services that could have been provided by Baylor Grapevine, and acceptance of a transfer of Johnson by Heart Hospital before ascertaining it had no available bed and without proper medical certification; and (4) failure of Baylor Grapevine to treat Johnson's case as a "sentinel event." Moore expresses opinions that harm resulted to Johnson, or unnecessary risks were taken with respect to Mr. Johnson's treatment, as a result of certain of these "violations" of the applicable standards of care.

In the trial court, the Baylor appellants and Dr. Feingold objected to Moore's qualifications to render standard-of-care opinions and the portion of Moore's expert report that addresses causation. On appeal, the Baylor appellants and Dr. Feingold do not contest the

---

[13] Appellees allege Baylor Scott & White and Baylor Grapevine were negligent in failing to have policies, procedures, or protocols in place to prevent transfer of a patient from Baylor Grapevine to Heart Hospital when the necessary "medical/surgical" services were available at Baylor Grapevine. Appellees also allege Baylor Scott & White and Baylor Grapevine were negligent under the doctrine of *respondeat superior* for their actual or apparent agents or employees at Baylor Grapevine who participated in the attempted transfer of Johnson to Heart Hospital. We note there are no opinions in the expert reports of Dr. Roughneen and Moore specifically directed at Baylor Scott & White. However, Baylor Scott & White has not complained in this appeal or in the trial court that there are no specific opinions directed to it and has complained in the trial court and in this appeal about the same expert report deficiencies asserted by Baylor Grapevine and Heart Hospital.

adequacy under section 74.351 of Moore's opinions regarding standards of care, breaches of the standards of care, or his qualifications to render those opinions. However, they contend Moore, who is not a licensed physician, may not provide causation opinions, and therefore his report is inadequate under section 74.351. Appellees respond in their appellate brief that they do not rely on Moore's report to establish causation; rather, they rely on the expert report of Dr. Roughneen. Appellees argue a physician such as Dr. Roughneen is permitted to rely on a non-physician's report in formulating his own opinions, and the trial court was free to consider Moore's report in conjunction with Dr. Roughneen's report in determining whether Dr. Roughneen's causation opinions satisfy the requirements of Chapter 74.

We agree Moore cannot render causation opinions that will satisfy the requirements of section 74.351. With exceptions inapplicable here, section 74.403(a) provides:

> [I]n a suit involving a health care liability claim against a physician or health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (West 2011). Although Moore could not provide opinions regarding causation, that alone does not render Moore's expert report inadequate. Section 74.351(i) specifically provides a claimant may satisfy the requirements of section 74.351 by serving reports of multiple experts regarding the conduct of a physician or health care provider. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i). As noted, the Baylor appellants and Dr. Feingold do not contest on appeal the adequacy of Moore's opinions regarding standards of care or breaches of the standards of care. Further, Dr. Roughneen is permitted to rely on a non-physician's report in formulating his own opinions concerning causation. *See Sosa*, 2016 WL 1457069, at *4; *Guerra*, 252 S.W.3d at 532–33.

We resolve the arguments of the Baylor appellants and Dr. Feingold that Moore's expert report is inadequate under section 74.351 against them. We conclude the trial court did not abuse its discretion in overruling the objection of the Baylor appellants and Dr. Feingold to Moore's report.

*Dr. Roughneen's Causation Opinions*

The Baylor appellants and Dr. Feingold assert Dr. Roughneen's causation opinions are conclusory and speculative. As previously articulated in this opinion, "[i]n showing how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven[.]" *Zamarripa*, 2017 WL 2492003, at *4. Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id*. (quoting *Goss*, 392 S.W.3d at 113). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission, the harm would not have occurred. *Id*. (quoting *Goss*, 392 S.W.3d at 113). "An expert must explain, based on facts set out in the report, how and why the breach caused the injury." *Van Ness*, 461 S.W.3d at 142. An expert may show causation by explaining a chain of events that begins with a defendant health care provider's negligence and ends in injury to the plaintiff. *See Satyu*, 2015 WL 3765771, at *8.

Dr. Roughneen opined the applicable standards of care for Dr. Feingold were to timely recognize a patient's vascular compromise and seek vascular surgery consultation, allow the vascular surgeon to complete his evaluation and treatment of the patient, and refrain from making vascular surgery decisions such as cancelling Johnson's initial vascular surgery consultation with Dr. Roughneen and attempting to transfer Johnson to Heart Hospital. Dr. Roughneen opined that Dr. Feingold breached the applicable standards of care by cancelling or

participating in the cancellation of Dr. Roughneen's initial vascular surgery consultation and attempting to transfer Johnson to Heart Hospital.[14]

Dr. Roughneen opined the applicable standards of care for Baylor Grapevine require that any transfer of a patient to another facility will result in the patient receiving a higher level of care than can be provided at the transferring hospital and the patient will not suffer harm caused by delays in medical care associated with transferring the patient. Dr. Roughneen opined Baylor Grapevine breached the standards of care by coordinating Johnson's transfer to Heart Hospital when it was known that Johnson was experiencing limb ischemia and that Baylor Grapevine had the capability to treat the condition. Dr. Roughneen opined the applicable standards of care for Heart Hospital require that before accepting a transfer of a patient from another facility it should determine whether the transferring facility has the capability to meet the surgical needs of the patient and, if so, to refrain from accepting the patient because the transfer will create harmful and needless delay in providing definitive care to the patient. Dr. Roughneen opined Heart Hospital breached the standards of care by coordinating the transfer of Johnson knowing that Baylor Grapevine had the capability to treat the patient and accepting the transfer of Johnson despite not having availability for him.[15]

---

[14] Dr. Roughneen indicated in his amended expert report that he had relied upon Moore's expert opinions regarding substandard care provided by Drs. Smith and Feingold and the Baylor appellants. According to Moore, Dr. Feingold acted in administrative capacities by directing hospital staff of Baylor Grapevine and Heart Hospital, and that Dr. Feingold made a decision to transfer Johnson to Heart Hospital knowing that Baylor Grapevine had both the capacity and capability to perform the vascular surgery Johnson required and without ascertaining bed availability at Heart Hospital before directing Baylor Grapevine staff to act on the transfer. Based on Baylor Grapevine medical records, Moore indicated that, in consultation with Drs. Feingold and Dave, Dr. Smith contacted Dr. Roughneen, "to assess Johnson for surgical intervention." After Dr. Feingold was at Johnson's bedside at 12:06 p.m., and following a 12:47 p.m. report from Dr. O'Connor that "arterial blood flow was not visualized at the level of the trifurcation vessels concerning for extremely diminished blood flow versus occlusion," a decision was made at 1:00 p.m. to transfer Johnson to Heart Hospital. According to Moore, because this entry appears in Emergency Department nursing notes, it appears Dr. Feingold approved or must have taken steps to initiate the transfer process. At 1:14 p.m., Dr. Feingold contacted a heart surgeon at Heart Hospital to discuss Johnson's condition, and that heart surgeon agreed to accept Johnson as a transfer patient to Heart Hospital. Dr. Roughneen, en route to Baylor Grapevine, was informed his services would not be needed and Johnson was being transferred to Heart Hospital. Thereafter, Heart Hospital informed the Emergency Department at Baylor Grapevine that it had no available beds and could not accept Johnson as a patient. Dr. Roughneen was again contacted and arrived at approximately 2:30 p.m. to assess Johnson. Dr. Feingold's notes of his consultation concerning Johnson were dictated at 3:27 p.m. and state there are no femoral pulses felt and no distal pulses felt in Johnson's right or left lower extremities and Johnson will require surgical intervention and emergent revascularization.

[15] Moore opined in his expert report that Heart Hospital accepted transfer of Johnson without proper medical certification justifying the transfer, and Heart Hospital accepted transfer of Johnson before ascertaining whether it had an available bed for Johnson.

Within the four corners of his amended expert report, Dr. Roughneen has made a good faith effort to provide a fair summary of his opinions concerning the six-hour "window of opportunity" to take corrective action restoring blood flow in this case and the adverse impact of unnecessary delay resulting from the aborted transfer of Johnson from Baylor Grapevine to Heart Hospital. According to Dr. Roughneen, there is a "window of opportunity" of about six hours for corrective action to restore blood flow before permanent tissue damage will occur. The longer the delay in surgical intervention, the worse the damage to the affected tissue. Dr. Roughneen has opined that had his initial vascular surgery consultation with Johnson, which was initiated at 11:50 a.m., not been cancelled by Drs. Feingold and Smith and an aborted attempt made by them to transfer Johnson to Heart Hospital, Johnson would have been taken to surgery by 1:45 p.m. and in reasonable medical probability Johnson's left leg would have been saved. Dr. Roughneen's amended expert report indicates that efforts of Baylor Grapevine and Heart Hospital to coordinate transfer of Johnson to Heart Hospital, a facility that did not offer a higher level of care than Baylor Grapevine and did not have availability for Johnson, and action by Heart Hospital initially accepting Johnson as a patient despite not having availability for him, caused needless and harmful delay in definitive care that resulted in loss of Johnson's left leg. According to Dr. Roughneen, these delays in surgical intervention resulting from breaches in the applicable standards of care by Drs. Smith and Feingold and the Baylor appellants caused Johnson to receive surgical intervention about six and one half hours after a blood clot caused his cardiac arrest; thus, in reasonable medical probability, surgical intervention occurred outside the "window of opportunity" to save Johnson's left leg.[16] The amended report contains sufficient information to explain "how and why" the cancellation of Johnson's initial vascular surgery

---

[16] Dr. Roughneen also stated in his amended expert report that the negligent acts and substandard care described in Moore's expert report were also a proximate cause of the loss of Johnson's left leg.

consultation with Dr. Roughneen and the aborted attempt to transfer Johnson to Heart Hospital resulted in surgery occurring outside the "window of opportunity" for successful corrective action and caused Johnson's injury. These opinions are not conclusory. *See Van Ness*, 461 S.W.3d at 142; *Fortner*, 399 S.W.3d at 383–84. Dr. Roughneen has explained the basis of his causation opinions by linking his conclusions to the facts of the case. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Fortner*, 399 S.W.3d at 379. Therefore, we cannot conclude the trial court abused its discretion by overruling an objection by the Baylor appellants and Dr. Feingold that Dr. Roughneen's opinions with regard to causation are conclusory and speculative.

We resolve the sole issue of the Baylor appellants and Dr. Feingold against them.

## Conclusion

We affirm the trial court's orders overruling appellants' objections to Dr. Roughneen's and Moore's expert reports and denying their motions to dismiss appellees' claims against them.

161261F.P05

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BLAKE SMITH, M.D.; BAYLOR SCOTT
& WHITE HEALTH SYSTEM; BAYLOR
REGIONAL MEDICAL CENTER AT
GRAPEVINE; TEXAS HEART HOSPITAL
OF THE SOUTHWEST LLP D/B/A THE
HEART HOSPITAL BAYLOR PLANO;
AND RICHARD FEINGOLD, D.O.,
Appellants

No. 05-16-01261-CV     V.

HARRY JOHNSON AND LYNN
JOHNSON, Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-16-01488.
Opinion delivered by Justice Fillmore,
Justices Whitehill and Boatright
participating.

 In accordance with this Court's opinion of this date, the trial court's orders denying appellants' motions to dismiss are **AFFIRMED**.

 It is **ORDERED** that appellees Harry Johnson and Lynn Johnson recover their costs of this appeal from appellants Blake Smith, M.D.; Baylor Scott & White Health System; Baylor Regional Medical Center at Grapevine; Texas Heart Hospital of the Southwest LLP; and Richard Feingold, M.D.

Judgment entered this 26th day of July, 2017.